### GIBBONS v. TERRITORY.

Nos. 2076 and 2103, Okla. T.  Opinion Filed June 22, 1908.

(96 Pac. 466.)

CRIMINAL LAW—Instructions—Reasonable Doubt. The trial court erred in instructing the jury that: "By the term 'reasonable doubt,' as used in these instructions, is meant a doubt that has a reason for it. It is a doubt that you can give a reason for"—and the same is cause for reversal of the judgment.

(Syllabus by the Court.)

*Error from District Court, Caddo County; Frank E. Gillette, Judge.*

Thomas Gibbons was convicted of murder, and brings error. Reversed.

At the November term, 1905, of the district court for the Seventh judicial district of the territory of Oklahoma, at Anadarko, Thomas Gibbons, plaintiff in error, defendant below, to-

gether with one M. C. Reddington, were jointly indicted for the murder of one T. C. Renfro, by shooting, alleged to have been committed in the county of Caddo on July 13th of that year. On November 27, 1905, defendant was arraigned, pleaded not guilty, asked for and was granted a severance, was tried by a jury, found guilty, and was sentenced to imprisonment for life, from which judgment and sentence he appealed to the Supreme Court of the territory of Oklahoma, and the case is now before us, as successor of that court, for review.

*P. H. Cullen*, for plaintiff in error.
*W. O. Cromwell, Atty. Gen.*, for the Territory.

TURNER, J. (after stating the facts as above). The evidence discloses that defendant was director of school district No. 115 in said county, and had been some time prior to the homicide, and that M. C. Reddington, jointly indicted with him, had been elected clerk and had resigned. On August 16, 1904, J. E. Beard, as treasurer of said district, called a meeting of the voters thereof for the purpose of electing a clerk to succeed Reddington. On August 26, 1904, at the meeting for that purpose, the deceased, Renfro, was elected clerk, and Reddington filed his resignation as such, and on November 16, 1904, turned the books over to him. On May 31, 1905, pursuant to a notice given by deceased, Renfro, as district clerk, for an election of officers for that district, defendant was elected for three years, M. C. Reddington clerk for an unexpired term of two years, and M. O. Nation treasurer for an unexpired term of one year. On the same day, Reddington duly qualified as such, and on June 13, 1905, together with Gibbons as director and Nation as treasurer, duly filed their acceptance of office with the superintendent of public instruction of Caddo county, as required by law. A short time thereafter, a report was filed with the county superintendent of Caddo county by deceased, Renfro, as clerk, in which he certified that at the school election held May 31, 1905, in school district No. 115, the following persons were elected to the respective offices therein set forth, viz.:

Thomas Gibbons, director; T. C. Renfro, clerk; and J. E. Beard, treasurer. That shortly thereafter Reddington, as clerk of said district, made a demand on the deceased, Renfro, for the books and records pertaining to said office, which he refused to surrender.

After securing the advice of the county attorney, defendant and Nation, as directors of school district No. 115, brought suit in replevin before one Dillingham, a justice of the peace, to recover said books; but the same was for some reason dismissed by the justice. On July 10, 1905, defendant, as director of said district, caused another suit in replevin to be brought, entitled, "School District No. 115 v. Thurston Renfro," before T. C. Britton, a justice of the peace, to recover from deceased the books and records aforesaid, and owing to the fact that there was no constable in that township, and failing to obtain the services of H. W. Boulware, a deputy sheriff, the justice of the peace on his own motion appointed Plowman as special constable to serve the process. He was a stranger to Renfro and slightly acquainted with the defendant, resided in another school district, was a man of delicate health, and of very defective eyesight. On the evening of the day the process was issued, Plowman went to Renfro's house to serve the papers, taking Nation along to identify the books and papers mentioned in the writ; but Renfro was not at home, and the process was not served at that time.

On the morning of the 12th, as Nation could not go on account of sickness, Gibbons accompanied Plowman in the service of the process in order to identify the property sought to be replevined. On exhibiting the process to Renfro, he declared the same to be improper, and refused to give up the property, and wheeled and went into the house, saying that he regarded any man trying to take possession of it as hunting trouble, and that "he would be damned sure to get it," at which Plowman and defendant rode off. That same day Plowman returned to the justice of the peace and sued out a writ charging Renfro with resisting him as an officer in the service of process and refusing to deliver the property sought to be replevined, which was placed in

his hands for service, returnable forthwith before said justice. Gibbons was present at that time, but did not advise the suing out of the writ, and was, without his seeking, appointed as a special deputy on Plowman's suggestion to assist him in the service of the process. The next morning, Plowman, accompanied by Gibbons, armed with the process aforesaid, went to the home of the deceased, Renfro, to serve the same. As they rode up, they found him and one J. B. Berry, a neighbor, seated under a tree near the house. After exchanging friendly salutations, Plowman produced the writ of replevin, which was read to the deceased. There is considerable conflict in the evidence from this time on as to what actually occurred. Berry, the only eye witness other than defendant, swore that Renfro agreed to give up the books. Gibbons swore that he declined to do so. Plowman dismounted; and, together with Renfro, approached the east door of the house coming from the north; Berry following at a short distance. Defendant remained seated on his horse. When within about eight feet of the door, something was said about a warrant, and Renfro, replied: "I will go with you." About that time defendant dismounted and hitched his horse and slowly approached Plowman and Renfro. Renfro, seeing him coming, ordered him to keep out of the yard. Plowman said: "Tom Gibbons, I deputize you to search the house." Renfro replied: "You cannot search the house without a search warrant." Renfro's manner was determined, and Plowman seemed very nervous. Renfro opened the east door and sprang into the house. There was a loaded rifle and a shotgun leaning against the west wall near the door and a 38 revolver, loaded, lying close by on a table. Defendant and Plowman were standing at the end of a plank leading to the east door about eight feet away. Here the testimony conflicts. Berry said that when Renfro entered the east door he was standing near the northeast corner of the house, when Plowman and defendant rushed abreast across his line of vision into the house, at which time the shooting commenced in the house. Defendant said that they did not enter the house, but that the firing was done by

Renfro from the inside, shooting at them through the open east doorway. Both agree that Plowman jumped back and ran around the southeast corner of the house, which consisted of one room 14x16, with a door in the east and west sides and a window in the north and south ends; that Renfro, rifle in hand, went out the west door and rushed around the southwest corner of the house, where he met Plowman. There was a shot fired by Renfro, and Plowman fell dead, shot in the back, his pistol, the only weapon he had, being found lying on the inside of his coat on the left side, which had been thrown back, indicating that it had been snapped once, but not fired. Here the testimony again conflicts. Berry says he was standing close to the northeast corner of the house, but could see diagonally through the door and through the window on the south; that he thus saw Renfro south of the house, and heard the shot, but did not see him fire. He said: That when Plowman and Gibbons first rushed in the house, and the firing took place, they both jumped back, and Plowman ran around the southeast corner, where he was shot; that Gibbons, after Plowman was shot, rushed back into the house, where he saw him and Renfro struggling; that he heard more shooting in the house, and started to leave the scene, when the shooting ceased, and Gibbons emerged from the house and hailed him after it was all over. Gibbons says: That, when Plowman rushed around the house in one direction, he went around the house in the other direction; that he started for the west gate, and saw Renfro coming back from the shooting of Plowman around the southwest corner of the house, when he (Gibbons) jumped back and sought shelter behind the north end of the house; that before he reached it Renfro fired at him, but missed and was upon him; that he had his pistol in his hand, and Renfro his rifle; that they grappled, and a struggle ensued for the rifle to keep Renfro from shooting him. In the struggle, while they were near the west door, he shot Renfro twice in the breast. Renfro's body was found in the house lying with his feet near the west door and his head a little north of east, near his bed with his rifle lying across his

body the butt being upon the floor the muzzle resting against the bed, with a deep cut as though made with a blunt instrument across his forehead.

The theory of the prosecution was that a conspiracy existed between Reddington and Gibbons to kill or "fix" Renfro, that ill feeling had existed between them some time, and that the process sought to be served on Renfro was a subterfuge under cover of which Gibbons went to deceased's house and killed him. The defense contended that the process was sued out and was sought to be served in good faith, that in its service deceased assaulted and killed Plowman without provocation, and that defendant killed Renfro in his own necessary self-defense while he was resisting lawful process.

Numerous errors were assigned by defendant, but the only one necessary for us to consider is that the court erred in charging the jury, over the objection and exception of defendant, as follows:

"By the term 'reasonable doubt,' as used in these instructions, is meant a doubt that has a reason for it. It is a doubt that you can give a reason for. It is that state of the case which, after a full consideration of all the evidence, leaves your minds in that condition that you cannot say that you feel an abiding conviction of the guilt of the defendant. You should not go beyond the evidence to hunt for doubt or entertain doubt from mere caprice or conjecture. Such doubt should arise from a candid and impartial consideration of all the evidence and facts and circumstances presented upon the trial. If, upon consideration of all the evidence, doubt does so arise, and by reason of it you cannot say that you are satisfied to a moral certainty of the guilt of the defendant, you should return your verdict herein of not guilty."

This instruction, in almost identical language, was disapproved in *Abbott v. Territory*, 20 Okla. 119, 94 Pac. 179, and that it does not state the law can no longer be considered an open question in this jurisdiction. This court, in that case, speaking through its learned Chief Justice, said:

"This same question has been before the Supreme Court of Iowa. An instruction in almost the identical language was dis-

approved in the case of *State v. Cohen,* 108 Iowa, 208, 78 N. W. 857, 75 Am. St. Rep. 213, where it was held that: 'An instruction defining a "reasonable doubt" as one that the jury are able to give a reason for is erroneous, as, in effect, placing the burden on defendant to furnish reasons for acquittal.' And where it was further held that: 'An instruction defining a "reasonable doubt" as one that the jury are able to give a reason for is erroneous, as requiring jurors to give reasons for their conclusions.' And in this case the court, speaking by Mr. Justice Ladd, used the following language: 'Nor can we approve the fifth instruction as a safe definition of "reasonable doubt." By a "reasonable doubt," as herein instructed is meant a doubt such as a reasonable man might entertain, after a careful review of all the evidence in the case, as to the guilt of the defendant. In a legal sense, a reasonable doubt is one which has some reason for its basis. It does not mean a doubt from mere caprice or groundless conjecture. A reasonable doubt is such a doubt as the jury are able to give a reason for. The last clause is one to which exception is taken. Who shall determine whether able to give a reason, and what kind of a reason will suffice? To whom shall it be given? One juror may declare he does not believe the defendant guilty. Under this instruction, another may demand his reason for so thinking. Indeed, each juror may in turn be held by his fellows to give his reasons for acquitting, though the better rule would seem to require these for convicting. The burden of finding reasons for not finding guilt established is thus cast on the defendant; whereas, it is on the state to make out a case excluding all reasonable doubt. Besides, jurors are not bound to give reasons to others for the conclusion reached.' In *Siberry v. State,* 133 Ind. 677, 33 N. E. 681, the Supreme Court of Indiana held that: 'It is erroneous to instruct the jury that a "reasonable doubt is such a doubt as the jury are able to give a reason for."' In *State v. Sauer,* 38 Minn. 439, 38 N. W. 355, Mr. Justice Mitchell, who delivered the opinion of the court, says: 'The most serious objection to it is that it is liable to be understood as meaning a doubt for which a person could express a reason in words. A person may, after a consideration and comparison of all the evidence, feel a reasonable doubt as to the guilt of a defendant, and yet find it difficult to state the reason for the doubt.' In *Owen v. United States,* 130 Fed. 279, 64 C. C. A. 525, an instruction in the following language: 'A reasonable ground of

doubt is one which is reasonable from the evidence. It must be a ground of doubt for which a reason can be given, which reason must be based upon the evidence or want of evidence'—was disapproved."

We are therefore of the opinion that the court erred in giving the instruction complained of, and for that reason the case should be reversed. It is not necessary to discuss the questions raised in the record on defendant's application for a new trial on account of newly discovered evidence.

The judgment of the trial court is reversed, and this cause remanded, with instructions to grant the defendant a new trial.

All the Justices concur.