## THOMAS GIBBONS v. TERRITORY.

No. A-318.   Opinion Filed March 7, 1911.

1.  GRAND JURY—Drawing—Irregularity—Waiver.  (a) Where an indictment was returned by a grand jury in Oklahoma Territory, prior to statehood, and the jury box from which the grand jurors composing said grand jury were drawn was not prepared in accordance with the provisions of sec. 6, chap. 46 (sec. 3313), of Wilson's Rev. & Ann. St., under the rule announced in the case of Sharp v. U. S., 138 Fed. 878, followed by our Supreme Court in McGinley v. State, 20 Okla, 218, such grand jury was illegal and indictments returned by it should be set aside on proper motion.

   (b) Where a grand jury is not legally formed the filing of a waiver by a person charged with crime, by his counsel, to the illegality of such grand jury, does not make such grand jury legal or validate its acts.

2.  INDICTMENT—Sufficiency—Jurisdiction—Waiver.  (a) Prior to statehood a valid indictment was a jurisdictional requirement in all felony cases under the provisions of the law in force in Oklahoma Territory, and no act of a person charged with crime could confer jurisdiction upon the courts of the territory to legally try any cause pending against such person.

   (b) Jurisdictional questions disclosed by the record are never waived and can be raised at any time before or after trial in a motion in arrest of judgment or even for the first time in the appellate court.

3.  WITNESSES—Cross-Examination—Impeachment—Evidence.  (a) When a witness on direct examination is interrogated relative to a conversation, the opposing party is entitled to draw out all the material portions of such conversation pertinent to the issues, on cross-examination.

   (b) The acts and conduct of a witness variant from his testimony, and inconsistent therewith, may be shown for the purpose of weakening the testimony of such witness.

4.  SAME.  (a) The cross-examination of a witness is not to be confined to the particular questions asked, nor the precise subjects called to his attention on direct examination.  The correct rule is to allow the cross-examination to extend to any matter not foreign to the subject matter of such examination and tending to limit, explain, or modify the same.

   (b) Testimony tending to show the interest or bias of a witness, or lack of it, drawn out on cross-examination, is not, and has never been regarded as collateral.

   (c) When a witness, though on cross-examination, gives adverse testimony to the person cross-examining, showing his

interest or bias in the case, or lack of it, such person is not bound to accept the statements of such witness as conclusive, but is entitled to offer proof contradicting such witness and tending to establish the existence of facts to the contrary.

5. **HOMICIDE—Evidence—Statement by Third Party in Presence of Accused—Admissibility.** (a) In order to entitle the state in a criminal prosecution for murder to introduce proof of threats made by some third person, for the purpose of binding the defendant, it must be made clear that the declaration or statement containing the threat was made in the presence and hearing of the person sought to be bound, and was such a declaration and made under such circumstances as called for serious admission or denial on his part.

(b) When in a criminal action testimony sought to be introduced, for the purpose of proving threats by implication, shows that the person whom it seeks to bind reproved the third party for making such statement and in no way acquiesced in or approved such action, it is inadmissible and should not be allowed to go to the jury.

6. **HOMICIDE—Evidence—Facts Showing Crimes of Deceased—Proper Rebuttal.** (a) An officer on trial for murder growing out of an attempt to serve civil and criminal process, when the issue of self-defense is raised, is entitled to introduce proof tending to show that deceased had committed a crime, and the result of serving such process would be to place in the hands of the officers the evidence of such offense, for the purpose of throwing light on the transaction and tending to show animus or hostility and who was probably the aggressor in the difficulty.

(b) When the officer has introduced such proof the state cannot show that the deceased was advised to commit such offense by a public officer or other person, for the purpose of minimizing the effect of the proof. The rule limits the proof that the state is entitled to introduce for this purpose to such as the deceased could have introduced in his defense had he been on trial charged with the offense.

7. **EVIDENCE—Experiments—Admissibility—Mutilation of Exhibits.** (a) When evidence of experiments is sought to be introduced it must be shown that the experiments were made under like conditions, on like material, with similar apparatus and under similar circumstances, fairly and honestly made and they must be testified to by competent persons having expert knowledge thereof.

(b) Proof of experiments made with fire-arms upon certain material for the purpose of shedding light on the effect of a rifle-shot from a specific kind of rifle on a specific kind of material, in order to be admissible must be made upon the same kind of material, in the same condition, by a competent person and fairly and honestly conducted.

(c) When evidence of experiments is offered it should be

admitted only when it is clear to the court that the jury will be enlightened and not confused.

(d) A trial court has no right to permit counsel for the state to mutilate exhibits of a defendant, introduced in his behalf, by making experiments on them, or otherwise.

8. **NEW TRIAL—Grounds—Witnesses Not Sworn.** (a) When a witness has been permitted to testify without being sworn, and this fact is unknown to counsel or the defendant until after the verdict, a new trial should be granted.

(b) The fact that the testimony given by an unsworn witness may not have been as material as other testimony received in evidence does not cure the error. The court cannot say upon what particular testimony the jury bases its verdict. It is the duty of the courts to see that persons on trial for their lives or liberty receive all the protection of the law.

9. **TRIAL—Instructions—Credibility of Witnesses.** An instruction advising the jury that they are at liberty to disregard the testimony of any witness whom they may believe from the evidence has testified falsely, except in so far as it is corroborated by other evidence, or facts and circumstances proven, is erroneous. The jury is not bound to believe any of the testimony of such witnesses whether corroborated or not. (See Rea v. State, 3 Okla. Cr. 269, 105 Pac. 381.)

10. **HOMICIDE—Self-Defense—Instructions.** Where a person is on trial for murder and the issue of self-defense is raised, it is error for the court to give an instruction which in effect tells the jury that any intent stated is sufficient to destroy the right of self-defense.

11. **SAME—Service of Process.** (a) Where a person is on trial for murder alleged to have been committed by him and the proof shows that he was an officer and had gone to the premises where the killing occurred for the purpose of serving certain process, and his defense is self-defense based on the contention that he was endeavoring to serve such process in a lawful manner, and while so doing was attacked by the deceased, it is error for the court to give an instruction on this phase of the case which leaves the jury to determine for themselves what constitutes serving processes in a lawful manner. For instruction condemned, see opinion.

(b) The manner in which processes may be served is an intricate legal question and when upon a trial of issues joined it becomes necessary for such question to be determined the court should carefully define it as applied to the facts in the record.

12. **SAME—Provocation by Accused.** (a) It is error for the court to give an instruction in a murder trial which destroys the right of self-defense. when that issue is raised, if bare intent and purpose to provoke a difficulty existed in the mind of the defendant. The rule is that the defendant must do some act at the time

of the difficulty which does provoke it. For instruction condemned see opinion.

(b) When in a homicide case the state endeavors to show that the defendant sought or brought on the difficulty, and the general rules of law are charged on this phase of the case, the court should define and state what character of acts on the part of the defendant would deprive him of the right of self-defense.

(c) Where the prosecution in a homicide case is based on the theory that the defendant provoked the difficulty, the character of the provocation in connection with the intent, should be set out and defined in separate affirmative charges.

13. HOMICIDE—Right of Accused as Officer to Carry Weapons—Instructions. Under our statute officers in the actual discharge of their official duties are entitled to carry weapons, and when any such officer is on trial for murder growing out of an effort to discharge his official duty and the proof shows that he was armed with and killed deceased with a weapon, the carrying of which is prohibited by law, except by officers in the discharge of their official duties, a charge requested by the defendant embodying the law on this proposition should be given.

(Syllabus by the Court.)

*Appeal from District Court, Caddo County; Frank M. Bailey, Judge.*

Thomas Gibbons was tried in the district court of Caddo county on a charge of murder and convicted of manslaughter in the first degree, and he appeals. Reversed and remanded.

*Barclay, Fountleroy & Cullen,* for plaintiff in error.

*Charles West,* Atty. Gen., and *Smith C. Matson,* Asst. Atty. Gen., for defendant in error.

ARMSTRONG, JUDGE. This case was tried once before and an appeal taken to the Supreme Court of Oklahoma Territory, and upon the coming of statehood the appeal was determined by the Oklahoma State Supreme Court in an opinion by Mr. Justice Turner, reported in 1 Okla. Cr. 198, 96 Pac. 466. A complete statement of the facts will be found in that opinion, and no good purpose could be served by a restatement here. In addition to the statement there, in the last trial had, from which the appeal we are now reviewing was taken, the state admitted that the deceased, Thurston Renfro, shot and killed special officer Ed. Plow-

man on Renfro's premises immediately before the killing of Renfro's by the plaintiff in error; and, further, that Plowman's death was caused by a bullet from a 25-35 Winchester.

We shall discuss the errors complained of in the order they are taken up in the briefs of counsel for the plaintiff in error and the state.

On the first trial of this case the appellant raised no objection to the sufficiency or regularity of the indictment. On the second trial, however, he was given permission to withdraw his plea of not guilty and file a motion to set aside the indictment. When the court permitted appellant to withdraw his plea of not guilty he then stood in the same attitude as if no plea had been entered, and the motion to set aside was in time. The motion to set aside the indictment was by the court overruled and he excepted. It appears that an attorney by the name of Lange, who originally appeared for the appellant, filed a written waiver to the grand jury and requested that all matters pending against the appellant be investigated by that grand jury. The drawing of the grand jury was clearly illegal under the holding of the United States Circuit Court of Appeals, in the case of *Sharp v. U. S.*, 138 Fed. 878, and in the case of *McGinley v. Territory*, 20 Okla. 218, the facts in the case at bar being practically the same as the facts in those cases. The only question which arises for our consideration is whether or not the filing of the waiver and the request, which is as follows:

"Comes now the defendant Thomas Gibbons by his attorney L. E. Lange and waives any and all objection to the panel of the grand jury and asks that all charges against him be investigated and reported by the present grand jury. L. E. Lange, Attorney for Defendant."

—precludes the appellant from raising this question. Counsel for appellant urges that he could not and did not waive the constitutional requirement that a legal indictment is a condition precedent to a conviction. Unless he could, and did, the indictment is insufficient and the motion to set aside should have been sus-

tained under the authority of the Sharp and McGinley cases, cited supra; this being an indictment returned prior to statehood, the rule announced in those cases would govern according to the rule announced by this court in *Ross Harris v. U. S.,* 4 Okla. Cr. 317.

In the 17th Ohio Reports, at page 222, in the case of *Doyle v. State,* the Supreme Court of that State, in discussing this proposition, says:

"The doctrine of waiver has nothing to do with criminal prosecutions. No person can be put upon his defense on the charge of crime, or be convicted of crime, except in the exact mode prescribed by law. And whenever it shall be made manifest, in the progress of a criminal prosecution, that the legal rights of the person charged have been violated, the court will permit the accused to have the benefit of the error. * * * The courts have the power only to try a person who has been indicted for crime. What an indictment is, is matter of law. Who shall constitute a grand jury, how it shall be summoned, composed and organized, is all a matter of positive law. No man can, by his consent or will, constitute a grand jury. No man, by express consent, can make that an indictment, authorizing the court to try that which, in fact was not an indictment."

The Court of Criminal Appeals of Texas, in discussing a similar proposition, in the case of *Rainey v. State,* 19 Tex. App. 479, in a very able opinion delivered by Judge Hurt, approves the doctrine laid down in the Doyle case, and among other things says:

" * * * Nor can the prisoner, either by mistake or unguardedly, confer jurisdiction on the courts to try and punish for felony. He will not be permitted to sacrifice his life or liberty, and entail infamy upon his posterity; for this mighty commonwealth has an interest in the lives, liberty and character of her citizens. Her policy, therefore, is to protect, not to destroy these, and hence it will not be permitted to the citizens to do so."

See, also, the case of *Finley v. The State,* 61 Ala. 201, in which it is held that all the acts of a grand jury which has not been organized according to law are void, and no laches of the accused will cure the illegality. See, also, *Royce v. Territory,* 5

Okla. 61, 47 Pac. 1083. In the case of *Ex parte Bain,* 121 U. S. 1, the following doctrine is announced:

"The declaration of Article V of the Amendments to the Constitution, that 'No person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury,' is jurisdictional, and no court of the United States has authority to try a prisoner without indictment or presentment in such cases. The indictment here referred to is the presentation to the proper court, under oath, by a grand jury, duly empaneled, of a charge describing an offense against the law for which the party charged may be punished."

The terms "indictment" and "presentment" in a Constitution presuppose and include the action of a grand jury. The grand jury must be a legal one or the indictment will be a nullity. *Lott v. State,* 18 Tex. App. 627.; *Ex p. Swain,* 19 Tex. App. 323; *Williams v. State,* 19 Tex. App. 265; *Smith v. State,* 19 Tex. App. 95. See, also, *State v. Beckey,* 44 N. W. 679; *State v. Russell,* 58 N. W. 915. Also *Thorpe v. People,* 24 Pac. 908. The case of *Brumer v. Superior Court,* from the Supreme Court of California, is directly in point on a strong argument. See, also, California cases there cited. A valid indictment returned by a legally constituted grand jury is a jurisdictional requirement. No person can, by his consent or will, constitute a grand jury, because it is not the accused or defendant but the law which makes a grand jury. *Brannigan v. People,* 3 Utah, 489; *Straughan v. State,* 16 Ark. 44; *Fitzgerald v. State,* 4 Wis. 412; *Mott v. State,* 29 Ark. 147. See, also, *Newcomb v. State,* 37 Miss. 383, wherein the court holds that the accused cannot waive objection to a void indictment; *State v. Burnett,* 119 Ind. 392; *People v. Granice,* 50 Cal. 447.

In the case of *Ex parte McClusky,* 40 Fed. Rep. 74 and 75, wherein the question of the effect of waiver was discussed, the court used the following language:

"Can a party consent to jurisdiction? Can he by an agreement with the government surrender his liberty for a stipulated time? Has any person the right to surrender his liberty in violation of a fundamental right secured to him for the protection of the liberty of such person by the Fifth Amendment to the

Constitution of the United States? No man or no power has the right to take away another man's liberty, even though with consent, except by due process of law. Due process of law, in a case like the one charged against petitioners, means compliance by the government with a fundamental requisite, such as that the party shall be charged with the crime in the way provided by the Constitution and laws of the United States. Liberty, under such Constitution and laws, is an inalienable prerogative, of which no no man, by mere agreement, can divest himself. Any divestiture not occurring by due process of law is null."

Mr. Cooley, in his Constitutional Limitations, says:

"A party may consent to waive rights of property, but the trial and punishment for public offenses are not within the province of individual consent or agreement. This means that by individual consent or agreement fundamental rights cannot be waived."

The Supreme Court of Alabama, in discussing the question of the effect of a void indictment, in the case of *Hall v. State,* 134 Ala. 90, 32 South. 756, used the following language:

"No objection was taken to the organization of the grand jury in the court below that preferred the indictment upon which the defendant was convicted. But this is of no consequence, if the illegality of its organization affirmatively appears in the record, since this court would be compelled to take the point, as no valid conviction can be based upon a void indictment."

We think the cases quoted from and those cited clearly show that the indictment in this case should have been set aside. This prosecution originated prior to statehood and the appellant is entitled to all the rights and benefits of all the laws in force at that time. *Ross Harris v. U. S., supra;* and *Birdwell et al. v. U. S.,* 4 Okla. Cr. 472. Under the law as it existed prior to statehood, as announced by the United States Circuit Court of Appeals and by the Supreme Court of this state in the cases cited *supra,* the grand jury that returned the indictment in this case was illegally constituted and under other authorities cited, its acts therefore void. Under still other authorities cited *supra,* it will be seen that no act of the appellant could confer jurisdiction upon the trial court to try this cause upon a void indictment.

It is urged by the Attorney General that this court, in the case of *Fooshee v. State,* 3 Okla. Cr. 666, 108 Pac. 554, has determined this proposition adversely to the contention of the plaintiff in error. A careful examination of that case will show that the questions raised here were not raised nor discussed in that case. The Fooshee case is one wherein the offense was committed subsequent to statehood and involved different questions and is not in point. The motion to set aside the indictment should have been sustained.

The appellant contends that the court erred in refusing to allow him to have the witness, Mrs. Notson (formerly the wife of the deceased, Renfro) give the whole of a conversation had between her, the defendant, and one Reddington, after having permitted a portion of the conversation containing alleged threats to go to the jury in chief. We think this contention is well taken. The general rule is that when a conversation is gone into in chief, all the material portions pertinent to the case can be drawn out on cross-examination. In the case of *U. S. v. Knowlton,* 13 N. W. 575, the Supreme Court of North Dakota says:

"No rule is plainer than that a party has the right, upon cross-examination, to have given all other parts of the same conversation not given on the examination in chief which will serve to explain or modify the tendency of that part testified to in chief."

This statement of the rule is sound and expresses our view.

In the case of *Sager v. State,* 11 Tex. App. 110, the court says:

"When the state has put in evidence a portion of the conversation between the defendant and another, the defense has the right to prove the whole of it on the same subject."

See, also, 142 U. S. 691.

In the 11th Pacific, 811, in the case of *Watrous v. Cunningham,* the court says in the syllabus:

"Where a witness on his examination in chief testifies to a part of a conversation had by him at a certain time and place,

the entire conversation is admissible in evidence on cross-examination"

—and in the opinion:

"When a witness has related anything which he said at a certain time and place and under a given state of facts it is competent to have him state all he uttered on such occasion."

See, also, *Walsh v. Patterson*, 59 Neb. 645, 81 N. W. 853; *Metzer v. State*, 39 Ind. 596; *Patrick v. Crome* 15 Colo. 543, 25 Pac. 985; *People v. Warren*, 122 Mich. 504.

Appellant contends that he was not permitted to show the acts of the witness, Mrs. Notson (formerly Mrs. Renfro), which were variant from her testimony, in order to impeach her. In the case of *Stewart v. State*, reported in 42 Fla. 591, the court says:

"The acts and conduct of a witness relative to the matter in controversy which are inconsistent with his testimony, likewise his motive, interest or animus as connected with the cause or parties thereto, may be proved for the purpose of weakening the force of his testimony."

See, also, *State v. Metheson*, 103 S. W. 137; *Brigham v. Clark et al.*, 100 Mass. 430.

The appellant complains that his right of cross-examination of state's witness, Mrs. Notson, and others, was limited by the trial court, to his injury. A careful reading of the record shows that counsel for the state continually objected to the defense asking witnesses any questions on any proposition not gone into by them on direct examination, whether germain to the issues or not, and a number of objections were sustained that we think should have been overruled. As a general rule the cross-examination of a witness cannot be confined strictly to the precise subjects called to his attention on the direct examination. It should be allowed to extend to any matter not foreign to the subject-matter of such examination and tending to limit, explain, or modify the same. The Supreme Court of Michigan, in the case of *People v. Barker*, 60 Michigan, 277, states the rule in the following language:

"Where a witness is sworn and gives some evidence, however formal, he is to be considered a witness for all purposes, and is subject to cross-examination upon all matters material to the issue."

See, also, *Haynes v. Ledyard,* 33 Mich. 319. In the case of *People v. Westlake,* 124 Cal. 452, the court says:

"It is always proper to cross-examine a witness fully as to all facts and circumstances connected with the matters stated in his direct examination."

See, also, *Marion v. State,* 20 Neb. 233; *Jorgenson v. Butte & Mont. Co.,* 13 Mont. 288.

The appellant next complains of the court in refusing to permit him to contradict statements made by the state's witness, Mrs. Dillingham, for the purpose of impeaching her and showing her extreme interest in his prosecution. The record shows that this witness admits writing a statement for a certain witness who testified to material facts on the former trial of this case and who afterwards admitted that such testimony was perjured, but claimed she learned the facts stated therein from the witness's mother, and that witness's mother requested her to write out said statement. The defendant offered the mother of such witness in his behalf for the purpose of contradicting Mrs. Dillingham, and the court refused to allow her to testify. The transcript of the evidence discloses the following proceedings on this point:

"Q. Didn't you with your own hands write out a statement and give it to Charley Argo as his testimony and direct him to testify to it? Q. Did you write out a statement for him? A. I wrote about half a dozen words of Charley Argo's testimony. Q. Wrote it out and gave it to him? A. No, sir. Q. You gave it to counsel? A. Yes, sir. Q. You don't mean to say that Col. Johnson did that? (Request the writing out of Argo's testimony) A. I don't know; some one of them asked us what we knew about the case; some of the attorneys, I don't remember which one, told if anything we could find out to write it down and hand it to them—anything that would help in the case—and Charley Argo's mother asked me to write it down. Q. She asked you to? A. Yes, sir. Q. How did she come to ask you to write it down?

A. When she told me what Charley knew, she said some of us ought to write it down and give it to the attorneys, for the child would be scared when he went on the stand up there and would forget it.   Q. Did'nt you go down to ·Charley Argo's house a short time before the trial and state that Charley Argo ought to know .something about this case?   A. No, sir.   Q. And his mother said if Charley knows anything about it, I don't know of it?   A. His mother did not say that.   Q. Did you have that talk?   A. No, sir.   Q. You, of course, talked friendly with his mother?   A. Yes, sir; I was at that time.   Q. You are yet?   A. No, sir; I am not.   Q. At that time you were friendly with her?   A. Yes, sir.   Q. Of course, you talked to his mother about taking the written statement on the roadside?   A. Yes, sir.   Q. Before or after Carswell met him at your house?   A. Before, or possibly afterwards.   Q. You have not seen him before or since you have taken the written statement?   A. No. sir; not to talk with him. Q. Had you ever talked with his mother about it before the time he came up and gave you the statement?   A. Yes, yes, yes, sir; his mother had told me what he knew about it."

The defense offered Mrs. Argo, the lady referred to by Mrs. Dillingham in her testimony, as a witness, to which objection was made, and the court sustained the objection to this testimony. What occurred in that respect, is shown by page 606 of the case-made, and is as follows:

"Q. State, if before the grand jury met or at any time before the last trial of this case you told Mrs. Dillingham that your son would be a witness in the case, and told her what he would testify to?   Mr. Vaughan: We object because it is a matter brought out by the defense at this time.   The court allowed the witness to answer relative to it over the objection of counsel for the state to show any feeling she may have had in the matter.   The Court: It occurs to me that is correct.   The objection will be sustained at this time.   Mr. Cullen:   The defendant excepts."

We think this testimony should have been admitted.   It is true that where a witness is cross-examined on matters clearly collateral the cross-examiner cannot inquire of other witnesses whether the answers are truthful, because the inquiry would be upon irrelevant issues, but the interest or bias of a witness has never been regarded as irrelevant.   The Supreme Court of Michi-

gan, in the case of *Geary v. People*, 22 Mich. 219, in discussing this identical principle used almost the exact language we have used here, and going further that court says:

"It goes directly to his credit and must determine with the jury how far facts depending on his evidence are to be regarded as proven.. A party cannot be compelled to put up with the statements of a witness concerning his own interests or personal relation to the case or parties, where it becomes necessary to know his position. * * * There was a time when any direct interest would have excluded a witness entirely. The law, in putting all disturbing influences on the same footing, and changing the rule of competency to a rule of credibility, has not made the question of interest collateral or irrelevant. It is still, as formerly, open to direct proof, and the witness may be impeached by showing contradictory statements regarding it. The administration of justice would be very defective if every witness could, without contradiction, make himself out impartial and disinterested, and run no risk of exposure. Under such a system the most dishonest witnesses would be likely to describe themselves as the most fair and reliable. * * * The quality of testimony is as important as its substance."

The facts in the case quoted from here were practically the same as the facts in the case at bar. In the case quoted from, the witness, on cross-examination, denied having made certain statements and the defendant sought to show that the witness had made the statements and the court refused to permit the proof to be made. The case was reversed on that ground. (See, also, *Com. v. Byron*, 14 Gray, 31; *Hartman v. Rogers*, 69 Cal. 643; *State v. Willingham*, 33 La. Ann. 537; *McMasters v. State*, 33 South. 2; *People v. Wasson*, 65 Cal. 538, 4 Pac. 555.) There is much stronger reason for allowing the appellant to introduce the testimony offered in this case than there was for admitting the testimony in the case of *Geary v. People, supra*. In the Geary case the statements were contradictory only, while in this case the proof sought to be introduced by appellant was not only contradictory but tended to show the most base and corrupt motive of

witness, and, if true, an extremely malicious and criminal interest in the prosecution.

Appellant next complains of the court in permitting the state to prove certain statements made by one Mike Reddington, who was jointly indicted with the appellant on this charge, which statements, the state contended, amounted to threats on the part of Reddington and acquiesced in by appellant, because such statements did not amount to threats and were not sanctioned by the appellant. The record shows that Reddington had been tried and acquitted. It is very clear from a careful reading of the record that the appellant did not approve of the conduct of Reddington at the time the alleged threats are said to have been made—in fact, the state's witnesses testify that he reproved Reddington for making them. The record on this point shows the following proceedings:

"(Examination of witness, Mrs. Renfro Notson): Q. Did you hear any conversation with themselves or with any one else in which they discussed Mr. Renfro? A. Yes, sir. Q. What was said? Mr. Cullen: If the court pleases, I want to make this point to the court. This testimony, we of course anticipate what it will be. Any statement made by a third person, even in the presence of the defendant, is not necessarily the statement of the defendant, but is the statement of a third party. The rule is if a statement manifesting any feeling is made by a third party to a person who subsequently becomes the defendant, and the man who subsequently becomes the defendant instead of sanctioning the remarks, reproves the party who has made such remarks, it is not evidence. These are the facts in this case and that is what they are trying to prove. * * * The Court: As a general proposition the conversation between the defendant and a third party, where anything in the nature of threats were made, it would be competent to show. Of course, the court does not know what the conversation was. The witness may answer the question, and if it is incompetent, it may be stricken out. Q. What was said? A. They called my husband a liar. Q. Who did? A. Mr. Reddington, I think, said that to me, and I said I believe you are mistaken, or you must be mistaken; my husband was not right there, and Mr.

5 Cr—15

Gibbons said, 'Hush, don't pay any attention to her, she is only half-witted anyway.' Q. What else was said? A. Mr. Redding-ton said, 'Never mind, we'll fix Renfro'—'We'll give that red-headed thing, or red-headed Rosy (they called me two or three different things), give me something to go to Anadarko for.' Mr. Morgan: 'We move to strike out the answer as incompetent, ir-relevant and immaterial and as not tending to prove or disprove any issue in the case, and as it is not evidence in form of threats, and this defendant is not bound by it.' The Court: Overruled. Mr. Morgan: Defendant excepts."

Other witnesses' testimony on this proposition makes appel-lant's position much stronger.

Admitting this testimony, in view of the record in this case, was clearly error. We do not think that these alleged threats were such as required the appellant to make a specific denial. In fact they were not such as required his attention in any man-ner, but the record shows that he reproved Reddington for having made them. The rule appears to be that evidence of this char-acter may be permitted to go to the jury whenever the occasion, upon which the declaration is made in the presence of the party, and the attendant circumstances call for serious admission or denial on his part. A careful reading of the entire testimony in this record should convince any reasonable, fair mind, that this conversation referred to never contemplated bodily harm to Renfro, but alluded to his prospective prosecution for having made alleged false returns of the results of a certain school election, and was a conversation in which appellant had no part, he being engaged in other matters, but present, and upon hearing the same reproved Reddington for engaging a half-witted woman in such con-versation. In the case of *Vail v. Strong*, 10 Vt. 463, the court says:

"But we know of no obligation upon the party to answer ev-ery idle or impertinent inquiry. He has the right to be silent, un-less there be good reason for speaking. We cannot admit that he is bound to disclose his private affairs, at the suggestion of idle curiosity, whenever such curiosity is indulged at the hazard of being concluded by every suggestion, which may be suffered to

pass unanswered. The true rule we understand to be this. Evidence of this character may be permitted to go to the jury, whenever the occasion, upon which the declaration is made in the presence of the party, and the attendant circumstances, call for serious admission or denial on his part; but the strength of the evidence depends altogether upon the force of the circumstances and the motives, which must impel him to an explicit denial, if the statement be untrue. But if no good reason exist to call for disclosure, and the party decline to enter into useless discussion, or answer idle curiosity, no legitimate inference to his prejudice can be drawn from his silence."

The Missouri Supreme Court, in discussing a similar proposition in the case of *State v. Glahn,* 11 S. W. 260, quoting part of what the witness's testimony was, says:

"The statement of the witness, Lon Wheeler, that he thought the man could be found in the field who committed the murder, should be excluded. It is true this statement was made in the presence of the defendant, but it was not such a statement as called for action or reply on the part of the defendant. Silence did not therefore amount to an admission."

See, also, *Low v. State,* 108 Tenn. 127, 65 S. W. 401; *Lawson v. State,* 20 Ala. 65.

The Supreme Court of Georgia, in discussing a similar proposition, says:

"The maxim is, in regard to admissions inferred from the acquiescence in the verbal statements of others, *qui tacet consentire videtur,* and is to be applied with careful discrimination. Nothing, it is said, can be more dangerous than this kind of evidence. It should always be received with caution, and never ought to be received at all, unless the evidence is of direct declarations of that kind which naturally call for contradiction; some assertion made to the party with respect to his right, which by his silence, he acquiesces in." (*Rolfe v. Rolfe,* 10 Ga. 143-5.)

See, also, *Moore v. Smith,* 14 S. & R. 388,

The next contention of the appellant is that the court erred in permitting the state to show that the county superintendent of public instruction had advised the deceased to make certain entries in his record as clerk of the school board for his district,

which amounted to a criminal act, after the defendant had proved the criminal act, in order to show motive on the part of the deceased for resorting to severe measures to retain possession of such school books, and his acts at the time of the killing, this killing having grown out of efforts on the part of the appellant as a director and others of the school board to secure possession of such records. It seems to us that this was a serious error. It is always competent for a defendant to prove facts or circumstances which tend to show the motive of the deceased in making an attack. The appellant contends that under the law he had the right to show that the deceased had committed a criminal act, and, further, that the officers were seeking to get possession of indisputable written evidence which fastened the crime upon the deceased, as a circumstance tending to show the animus of the deceased and the likelihood of his making the attack on the officers which the appellant claims that he did make. Appellant was permitted to make this showing and the state on rebuttal was permitted, over the objection and exception of the defendant, to show that the deceased, in making the entries in the records which defendant contends were false, did so under the advice of the county superintendent of public instruction.

Appellant contends that the jury, being unlearned in the law, would naturally conclude that no crime was committed, if the act was done pursuant to the direction of a public officer, and that the admission of such testimony in rebuttal was harmful to him, especially when the court failed to instruct the jury as to its effect. As a general rule it is no defense or excuse for an accused person to assert and prove that he acted in good faith under the advice of counsel or otherwise, and the courts have repeatedly held that such proof is not admissible upon the trial of a person charged with an offense. The rule is well stated in *Hoover v. State,* 59 Ala. 57, and also in *Weston v. Com.,* 111 Pa. St. 251. In that case the court said:

"Whatever legal rights the defendant might have as to property claimed by him, he could set up and avail himself of whether he

had been advised of them or not. The giving of the advise neither increases nor diminishes his criminality in any degree, and therefore it was irrelevant."

In the case of *State v. Foster,* 22 R. I. 163, the defendant offered to prove that he went to the State Treasurer and tendered payment of a certain tax prescribed by the statute of that state and that the treasurer advised him that he, being a resident of the state, and having a permanent place of business there, didn't come within the provisions of the statute. This offer was objected to as being immaterial and ruled inadmissible by the court. The Supreme Court of Rhode Island, in passing on the exception, says:

"The ruling was correct. Ignorance of the law will not excuse its violation, even when one endeavors to ascertain the law and is misled by advice of counsel."

—quoting with approval *Hoover v. State,* 59 Ala. 60. (See, also, *U. S. v. Anthony,* 24 Fed. Cas. No. 14,459; *People v. Weed,* 29 Hun, 628; *Merano v. State,* 32 Tex. Crim. 214, 22 S. W. 684.)

We think the rule as stated in the cases quoted is the correct one, and we approve it. The court should not have permitted the state to introduce this testimony in rebuttal. If the deceased had been on trial for committing the offense, he could not have introduced this character of testimony in justification of his acts. Neither could the state take from the defendant the force and effect of this testimony by explaining it in a manner that the deceased could not have done in protection of his own liberty. The state was entitled to introduce only such proof in explanation of the entries made in the school records as the deceased could have made under the law if he had been on trial for the offense of making them.

The next contention of the appellant is that the court erred in allowing certain experiments to be made by the state upon one of his exhibits, to wit, a certain door, when it was admitted that the exhibit was not in the same condition that it was at the time of the homicide; and, further, that the court erred in allowing parties to testify as to the result of such experiments,

said parties not being qualified as experts. The testimony on behalf of the defendant was to the effect that the deceased, Renfro, was placed under arrest and that he immediately sprang into his house, seized a 25-35 Winchester rifle, and fired through the door, the bullet passing between the appellant and Plowman. The door was made out of boards, and hung on strap hinges, and if opened suddenly would swing back partially shut; that this door when opened by the deceased, Renfro, as aforesaid, in swinging back, had been struck by one of the bullets from the Winchester rifle. The door was introduced in evidence and exhibited to the jury as the east door of the Renfro house, and shows what appeared to be a bullet hole of about three years' standing. One witness, Nation, who was qualified as an expert in gunnery for the defendant, testified that "this mark in the door was made from a ball fired from a gun in my judgment; the ball was about 25-35 and must have been fired from a high-calibre rifle; it was fired at angle, entering from the inside of the door and splintering the outside." The door was introduced in evidence and exhibited to the jury to show an old bullet hole, entering on the inside of the door, and passing diagonally through and splintering the outside. No objection was made by the state to the introduction of the exhibit and it became a part of the testimony in the case and was examined by the jury. On the day following the introduction of the door, counsel for the state applied to the court for permission to withdraw the 25-35 Winchester rifle that had been offered in evidence, and also withdraw the door in question and asked that the sheriff be directed to take the rifle and door and three cartridges and swing the door upon hinges to a post and fire three shots through the door at angles as near as possible in keeping with the angle of the hole in the door. The defendant objected, and, after considerable argument by counsel on both sides, the court permitted the exhibits to be withdrawn, but refused to direct any person to make the experiment asked by counsel for the state, to which the appellant excepted. Certain witnesses, who were not experts either in gunnery or timber, took

the door to some place in Anadarko and fired shots through it, using, as they testified, a 25-35 Winchester rifle loaded with Peters shells. The record discloses the following testimony by these witnesses:

"Q. What position was this door in at the time you fired this shot? A. It was at a considerable angle from me; I suppose this is about the position the door was in and the angle I was from it (witness illustrating) and we had it swung up; it was swinging. Q. How was it swung? A. Swung on hinges to a telephone post; it was stopped and not moving on the hinges at the time the shot was fired. Q. And this is the angle of the ball? A. Yes, sir. Q. Where did it go out. A. Right here at this point. Mr. Vaughan: The state offers the door with the additional holes in it in evidence in the case and offer it for the inspection of the jury. Mr. Cullen: Defendant objects as before. The Court: Overruled. Mr. Cullen: Defendant excepts. Q. I will ask you at the time you fired the shot how far you were away from the point where the ball struck the door? A. About ten feet; we measured it. Q. How far away was the muzzle of the gun? A. I just held it out this way, probably eight feet. * * * Q. Which is the older, the break or crack in the door, or the door? A. I cannot say. Q. Can't you tell whether this was broke off before the hole was made in the door or not? A. No, sir. Q. You don't know much about wood? A. No, sir; I cannot say what kind of wood it is."

Ordinarily the question of the admissibility of evidence of experiments is for the determination of the court, but before such evidence can be admitted it must be proven that the experiments were made under similar conditions and when they are of such character they can only be testified to by experts. The parties making the experiments should have expert knowledge. It appears in this case that the persons who conducted the experiments had very little knowledge, if any, of timber; in fact they did not even know what kind of wood the door was made of; the record elsewhere discloses the fact, however, that it was made of ordinary, rough cottonwood. In the 97th N. W. 825, the Supreme Court of Nebraska says:

"It must be shown that the person who makes the experiment

is competent to do so, that the apparatus used was of the kind and in the condition suitable for the experiment, and that the experiment was honestly and fairly made."

The Supreme Court of Florida, in the case of *Hisler v. State*, 42 South. 692, states the rule as follows:

"Evidence of an experiment whereby to test the truth of testimony that a certain thing occurred is not admissible, where the conditions attending the alleged occurrence and the experiment are not shown to be similar. The similarity of circumstances and conditions go to the admissibility of the evidence and must be determined by the court. If in the discretion of the trial court, such preferred evidence is rejected the appellate court will not review the ruling, unless an abuse of discretion appears. But where such evidence is admitted over proper objections, and the rule as to similarity of circumstances and conditions attending the occurrence and the experiment does not appear to have been complied with in admitting the evidence, the appellate court will review the ruling, and if error be found therein, and it does not appear from the whole record that no harm could have resulted to the defendant from the admission of such evidence, the error may cause a reversal of the judgment. Evidence of this kind should be received with caution, and only be admitted when it is obvious to the court from the nature of the experiments that the jury will be enlightened, rather than confused. In many instances a slight change in the conditions under which the experiment is made will so distort the result as to wholly destroy its value as evidence and make it harmful rather than helpful."

It appears to us that when the court concluded to permit an experiment of this kind, that the person making the experiment should have been required to use a similar gun and similar material; it being agreed that this timber had been exposed and was four or five years older than when the trouble occurred, it was improper to allow the experiment to be made on the same material.

It seems to us it was improper for another reason. This exhibit, having been introduced by the appellant, was withdrawn, taken out, and mutilated at the instance of the prosecution, over

the objection of the appellant, in such a way as to deprive him of its use in another trial. The state had no right to mutilate the exhibits of the appellant, and it is very clear that little or no light was or could have been thrown on this controversy by reason of the action had. We think that the court erred in permitting the exhibits to be withdrawn and permitting the experiments to be made in the manner in which they were made. (See *Tensy v. State,* 77 Ala. 33; *Evans v. State,* 109 Ala. 11, 19 South. 535; *Hisler v. State,* 42 South. 692; *Morton v. State,* 71 S. W. 281; *State v. Justis,* 11 Ore. 178, 8 Pac. 337; 50 Am. Rep. 470; *People v. Soldani,* 91 Pac. 654; 5 Ency. Ev. 470.)

We do not deem it necessary to discuss the error complained of involving the cross-examination of the witness Reddington, as this question is not likely to arise on a retrial, since this case is to be reversed on other grounds.

The next complaint of the appellant is that the court erred in not granting a new trial because the testimony of the witness Bouleware was heard against the defendant without said witness having been sworn. It appears that the fact that this witness was not sworn was not discovered by the appellant or his counsel until after the verdict, and is one of the assignments urged in the motion for a new trial. The Attorney General urges that the witness gave his testimony as if under oath and there was no error in overruling the motion for a new trial on this ground. In the case of *Hawks v. Baker,* 6 Me. 72, in discussing a proposition of this kind which arose in a civil case, the court there held that the verdict was properly set aside because evidence was permitted to go to the jury from witnesses who had not been sworn. There is much stronger reason for this rule in a criminal case than in a civil case, especially one that involves as serious consequences as a charge of murder. If the jury is entitled to receive the testimony of one witness who is not sworn there is no reason why all the witnesses should not be allowed to testify in the same manner. This is contrary to fundamental principles. The testimony of no witness should be received who has not been prop-

erly sworn. It might be argued that the testimony of the witness on the point received was not of serious importance. The court cannot always tell upon what particular testimony a jury bases its verdict, and a man on trial for his life or liberty is entitled to all of the protection of the law. (See *Regg v. James,* 6 Cox C. C. 5.)

The next error complained of by the appellant is as to instruction No. 2, given by the court, which reads as follows:

"In this connection you are instructed, gentlemen of the jury, that if you believe from the evidence in this case that any witness has knowingly and wilfully testified falsely as to any material fact in the case, you have a right to disregard any or all of the testimony of such witness except in so far as it is corroborated by other credible evidence or by facts and circumstances proven."

This court, in the case of *Rea v. State,* 3 Okla. Cr. 269, 105 Pac. 381, in discussing an identical instruction, in an opinion by Presiding Judge Furman, said:

"Section 5518, Wilson's Rev. & Ann. St. 1903, says that the court must instruct the jury that they are the exclusive judges of all questions of fact. The latter part of the instruction given contradicts this statute, by directing the jury in mandatory terms to accept and be bound by certain evidence, under the contingency therein stated. The court had no right to engraft this exception upon the law. The doctrine expressed by the Supreme Court of Kansas is in harmony with our statute. It matters not how anxious this court may be to enforce the law, we cannot allow a conviction to stand which is based upon a violation of plain and mandatory statutes which go to the foundation of the case, and which action deprived the defendant of substantial rights upon the trial. The law is plain and simple, and must be followed in all matters involving the substantial rights of the defendant."

See, also, *Thompson v. State,* 21 W. Va. 74; *State v. Musgrove,* 43 W. Va. 672. The instruction was erroneous and should not have been given in this form.

The appellant next complains of the court in giving instruction No. 16, which is as follows:

"You have been instructed, gentlemen of the jury, that homicide is murder when perpetrated without authority of law and with the premeditated design to .effect the death of the person killed. and the defendant has offered in this case certain proof in rebuttal of any premeditated design, defendant contending that at the time of the killing he was rightfully at the premises of the deceased assisting in the service and execution of a certain writ of replevin and the process upon the deceased. And you are instructed, gentlemen of the jury, that if you believe from the evidence the defendant went to the premises of the deceased with the purpose and intent to aid in securing the possession of the property called for in the writ of replevin issued by the justice of the peace and without any design to provoke a difficulty with the deceased and while attempting to execute such process in a lawful manner, the deceased made an assault upon the defendant and one Plowman which endangered their lives or subjected them or either of them to great personal injury, then the defendant was justified in resisting such assault and in using such force as was apparently necessary, judging from the standpoint of the defendant, to put himself in a position of safety, even to the extent of killing the deceased."

—and in refusing to give his requested instruction, which is as follows:

"You are instructed that in the service of a writ of replevin an officer may break open any building or inclosure in which the property claimed is concealed when the entrance thereto has been refused upon demand and the possession of the property called for by the writ has been denied."

Under the instruction given, *any intent* of the defendant other than the intent to secure possession of the property is declared sufficient to destroy the right of self-defense. We think this idea is clearly expressed in the instruction. The appellant went to the place where this killing occurred as a sworn officer to serve or assist in serving a criminal warrant and certain civil process. This instruction ignores his rights if he went in that capacity and destroys his right of self-defense and authorizes the jury to convict him if he went there with *any intent* other than to secure possession of the property. This instruction is griev-

ously erroneous for further reasons. Under this instruction, before the defendant had a right to act in his own defense at all the jury are requested to believe that he was attempting to execute certain civil process in a lawful manner, and in the other instructions given the jury is allowed to determine what is the lawful manner of serving process within the meaning of the law as applied to the state of facts in this record. What the legal manner is in which processes may be served is a question of law, upon which courts and great legal writers have differed, and to submit such questions to a jury, unlearned in the law, to decide, was gross error. The necessity of explaining and defining these terms was stronger in this case because the proof showed the defendant was a special officer, and acts which might be called lawless in a private citizen were lawful when committed by him, and what might be a fault in a private citizen might become the highest virtue in an officer in the proper discharge of his official duties. The first part of this instruction is an unnecessary preamble. It appears to be an effort to state the issues, and the fair, reasonable interpretation of it is that there was no premeditated design in the case, provided the defendant was rightfully at the premises of the deceased assisting in the service and execution of a certain civil process. If he was there not rightfully, then the effect of the instruction was to state that there was no proof in rebuttal of premeditated design, which is an unwarranted comment on the defense made by the defendant and left out of consideration many other facts and circumstances clearly tending to show absence of premeditated design. Following the preparatory part of said instruction, the court obviously undertook to inform the jury under what state of facts they could find the defendant was lawfully at the premises and required that body to find that the three following propositions were established as a basis of conclusion that the defendant was rightfully at the premises: First, with the purpose and intent to aid in securing the possession of the property called for in the process issued by the justice of the peace; second, without any design to provoke a difficulty with

the deceased; third, while attempting to execute such process in a *lawful manner*. We think the foregoing is a fair and accurate analysis of said instruction, and the practical effect of said instruction was that the proof in rebuttal of any premeditated design in the case was destroyed if the defendant was not rightfully on the premises assisting in the service of certain civil process upon the deceased. Under this instruction the jury were bound to find the existence of the three above-stated hypotheses before they could find that the defendant was in a position which justified him in resisting any assault made upon him or Plowman.

The appellant next complains that the court erred in giving instruction No. 18, and in refusing to give certain instructions requested by the defendant, as follows:

## "Instruction No. 18.

"You are further instructed, gentlemen of the jury, that under the law the right of self-defense does not imply the right of attack, and if you believe from the evidence in this case, beyond a reasonable doubt, that the defendant procured himself to be deputized as a deputy constable and armed himself with a pistol, and in company with one Plowman, proceeded to the house of the deceased Renfro and sought the deceased with the felonious intent to then and there kill the deceased, and with such felonious intent the defendant did then and there kill the deceased, then the defendant cannot invoke the law of self-defense.

## "Defendant's Refused F.

"The court instructs the jury that even though you may believe an ill and unfriendly feeling existed between the defendant and Renfro, and even though you believe that Gibbons, the defendant, knew that if he went to the premises of Renfro it would likely cause Renfro to become angry and resist by force any demand made upon him for the delivery of the books, yet you are instructed that Gibbons, as a director of School District No. 115, had a right to go to the premises of Renfro, either alone or in connection with Plowman, and if Plowman called upon Gibbons to aid him in executing the papers which were then in his possession, it was Gibbons' duty to go to the aid or assistance of Plowman, and he was authorized to meet force with force and to kill Renfro

if reasonably necessary or apparently necessary to protect his own life or the life of Plowman.

## "Defendant's Refused H.

"The court instructs the jury that under the evidence in this case the defendant, Thomas Gibbons, was one of the legally elected and qualified school directors of School District No. 115, and as such was entitled to demand the books and papers belonging to said district, and the mere fact that he instituted a suit in replevin to obtain the possession of said papers and accompanied Plowman to Renfro's place on the day before and on the day of the tragedy, did not make him a wrongdoer or impair his right to defend himself.

## "Defendant's Refused I.

"The court instructs the jury that there is no evidence in this case showing or tending to show that the replevin suit mentioned in the evidence or the criminal prosecution mentioned in the evidence was instituted for any purpose other than a lawful purpose."

The instruction given (No. 18) deprived the appellant of the right of self-defense. Under it, intent alone destroys the right of self-defense. Even though defendant committed no overt act and was guilty of no provoking conduct leading up to the killing, yet if he went to the premises of the deceased with an intent, the existence of this intent, though not revealed by word or act, deprives him of the right to defend his life. This is not the law. The Court of Criminal Appeals of Texas, in the case of *Tardy v. State,* 78 S. W. 1077, in discussing a similar proposition, says:

"This charge is erroneous, and, under all the authorities, it is laid down that bare intent and purpose to provoke a difficulty does not deprive defendant of the perfect right of self-defense. He must do some act or something at the time of the difficulty that does provoke the same."

The instruction is erroneous for the further reason that it does not define or explain the legal meaning of the expression "sought or brought on the difficulty." These are legal terms and should have been defined by the court. Wharton says:

"Where rules of law with reference to bringing on a difficulty are charged, the court should define and state what character of acts on the part of the accused would deprive him of the right of self-defense. And where a prosecution for homicide is carried on on the theory that the defendant provoked the difficulty in which the killing was done, the character of the provocation, in connection with the intent, should be set out and defined in separate and affirmative charges in behalf of the state."

The charge is subject to the further criticism that it does not require the jury to find that the defendant sought or brought on the difficulty by an overt act of aggression or by any unlawful act or word. The jury was left to determine for themselves what amounted to bringing on the difficulty, and were in effect authorized to disregard the right of self-defense if they thought the defendant provoked the difficulty by engaging in a dispute, or any act, lawful or otherwise, that contributed to bringing it on. The instruction is in the alternative and deprives the appellant of the right of self-defense if he sought *or* brought on the difficulty. Seeking a difficulty is a broad, general term, and in its popular sense he might be said to have sought the difficulty if he went there expecting attack to be made on him; but of course this was not the bringing on of the difficulty in a legal sense. One is not justified in killing another because the other harbors a murderous intent, and the right to defend one's self is not forfeited because there is in the mind intent and design. Intent unrevealed is like thoughts unexpressed, and the existence of an intent should never warrant the taking of human life or prevent the protection of it. The giving of this instruction was error. (*Mundine v. State,* 38 S. W. 622; *State v. Airhart,* 51 S. W. 214; *Wrage v. State,* 54 S. W. 602; *Tardy v. State,* 78 S. W. 1077; *Mozie v. State,* 51 S. W. 251; Wharton on Homicide, 3rd Ed., sec. 323.)

The appellant requested the court to give the following instruction, which request was refused:

"The court instructs the jury that under the law both Plow-

man ·and the defendant, when they went to Renfro's place on the 13th of July, had a right to carry arms."

Appellant and Plowman were acting in the capacity of officers in the discharge of official. duty, and under the statute were entitled to carry arms, and appellant was entitled to this instruction.

We think the court should have given appellant's requested instructions, designated as "F," "H," and "I," quoted *supra*.

There are other errors complained of and other assignments, which, without a close analysis, appear to be well taken, but we think the material grounds in this case have been covered in a manner that will enable the court to avoid reversible errors on a trial anew of this case, should it be tried again.

For the errors indicated, the judgment of the court below is reversed and this cause remanded for proceedings in accordance with the views expressed in this opinion.

· FURMAN, Presiding Judge, and DOYLE, Judge, concur.