Robert Ray HIGH, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A-13517.

Court of Criminal Appeals of Oklahoma.

March 3, 1965.

Rehearing Denied April 28, 1965.

Leland Anderson, pro se.

Charles Nesbitt, Atty. Gen., Hugh H. Collum, Asst. Atty. Gen., for respondents.

190

Miskovsky, Sullivan, Embry & Miskovsky, Oklahoma City, for plaintiff in error.

Charles Nesbitt, Atty. Gen., F. Burck Bailey, Asst. Atty. Gen., for defendant in error.

NIX, Judge.

Defendant in Error, Robert Ray High, hereinafter referred to as the defendant, was charged in the Superior Court of Comanche County with the crime of Murder. He was tried by a jury, found guilty of the lesser and included offense of Manslaughter First Degree, and sentenced to Thirty Years in the Penitentiary. From that judgment and sentence he has perfected his timely appeal to this Court alleging three propositions of error:

(1) The Court should have directed the jury to return a verdict of not guilty and failing to do so should have sustained the Motion for New Trial.

(2) The Court should have sustained the supplemental Motion for New Trial on the ground of newly discovered evidence.

(3) The rights of the defendant have been deprived under Art. 2, Sec. 7, Constitution of the State of Oklahoma, and Amendment XIV of the Constitution of the United States.

Before discussing these propositions, it will be necessary to set forth the facts of the case in substance.

During the evening of September 2, 1964, defendant strangled his wife with a length of thin rope causing her death by asphyxiation.

It was brought out during the course of the testimony that the deceased had been seeing a Sgt. Ferguson with whom she worked at Ft. Sill. There had apparently been much domestic trouble—enough that deceased's family was concerned sufficiently to try to intervene and talk with the parties involved. Her brother, Alfred Lutonsky, testified that he had warned defendant not to hurt his sister, and to give her the divorce she wanted. (cm 48–49) This occurred some two to three weeks before the crime.

Defendant contends he blacked out and knew nothing of killing his wife until he was holding her in his arms on the bathroom floor. Some of the testimony, concerning the events of that evening, is as follows:

"DEPUTY SHERIFF HENRY HOSKINS:

"A. I received a telephone call.

"Q. Now, do you know who that call was from?

"A. Ray High.

"Q. How did you know that, Bus?

"A. He told me.

"Q. What did he say to you?

"A. He said, 'You can send an ambulance now. My wife is dead.'

"Q. What did you do then? In response to that?

"A. I said, 'What happened, Ray?' And he never answered me and said, 'You can come first if you want to.'

"Q. Did you go to Sterling?

"A. I did.

"Q. What did you find when you got there?

"A. I found Ray and Dr. Hixon and Lucille High dead in the bathroom.

"Q. Did you talk to Ray at that time?

"A. A few minutes later.

"Q. What was said?

"A. I asked him what happened after advising him of his rights and he just shook his head 'No'. I said, 'Who found her?' And he said, 'Nobody found her, I did it. I thought you knew.'

"Q. Did he make any statement as to why he did it?

"A. He did not.

"Q. Did he show any symptoms of being ill, or anything of that nature?

"A. Not that I could tell.

"Q. Did he say anything about having been poisoned or anything of that nature?

"A. He did not.

"MARVIN LUTONSKY, DECEAS-ED'S BROTHER:

"Q. Now on the evening of the 2nd of September, did you go to the home of Ray and Lucille?

"A. Yes, sir.

"Q. How come you to go there?

"A. Ray sent Rosetta, that's his daughter, out to the house. That's four miles east of Sterling and she said that daddy said mother's sick, for me to come in. And so I got in the car and went in and I met Ray at the door. He met me at the door and he asked me if the children got out to the house all right. And I told him they had, and he asked me if I had seen Albert Jacobi and I said, 'No'. And he said 'Well, he will be here in a minute.' And I asked him if Lucille was sick and he said, 'Yes', and I said, 'What seems to be wrong with her?' And he said, 'Wait until Albert gets here and I will tell both of you.' And just about that instant Albert drove up and I asked Ray, I said, 'Ray, what's the trouble; what seems to be the matter with Lucille?' And he said, 'You may feel like killing me, but Lucille is dead.' And then we all went into the house.

"Q. Now, turn around and tell that so the gentleman on the back seat can hear you.

"A. As I got there, Ray said, 'You may feel like killing me but Lucille is dead.' And so we went into the house and the bedroom doors was all shut. It was a four-bedroom home, two bedrooms on the east; two on the west and a bathroom center of the two bedrooms on the west. And Albert asked where she was at and Ray pointed to the bathroom and Albert opened the door

and I was next to him and he pushed me back and said, 'Marvin, she looks awful.' And I told him to see if she had any pulse and he went in and said there was no pulse, and then Ray advised us to bring him into Lawton. And I told him to call the Sheriff's Department and Ray himself called the Sheriff's Department and told them to come out that his wife was dead.

"ALBERT JACOBI, DECEASED'S COUSIN:

"Q. Albert, on the 2nd of September of last year, did you go to the High home in Sterling?

"A. Yes, sir.

"Q. In the evening of that day?

"A. Yes, sir.

"Q. How come you to go there?

"A. I got a phone call down there. My wife had told me that Ray called and wanted me to come up and take them to Lawton.

"Q. What did you do in response to that?

"A. I went on up there.

"Q. Well, what did you find when you got there?

"A. They were on the porch, Marvin and Ray and as quick as I got there * * *

"Q. You mean Marvin Lutonsky that just testified here?

"A. Yes, and as quick as I stepped on the porch why Ray said, 'You all might want to kill me, Lucille is dead'.

\*      \*      \*      \*      \*      \*

"Q. What did you do then?

"A. Well, we went on in the house and went in the east bedroom and started back out of the hall and I don't know whether Ray mentioned or whether I just went to the bathroom but I just opened the door and located the body.

"Q. In what condition did you find the body?

"A. Well, she was laying on her back with a cord wrapped around her neck.

"LOIS JACOBI: (Testified as to the morning of Sept. 2nd.)

"Q. Very well, Mrs. Jacobi, did you receive any call at your home on the evening of the 2nd of September of last year from Ray High?

"A. Yes, sir, I did.

"Q. Was Ray High at your home on the morning of that day?

"A. Yes, sir.

"Q. What was he doing there, do you know what his business was there at that time?

"A. I don't suppose he had any particular business. He just came to visit a while and talk.

"Q. Was Albert, your husband, there when he first came?

"A. No, sir.

"Q. Where was Albert?

"A. He was in the field.

"Q. In the field working. Now did Ray talk to you any about his private family life at that time?

"A. Yes, he did.

"Q. What did he say to you?

"A. Well, he was talking about they weren't getting along any better, and he said that Lucille was afraid he was going to kill her, and he said, 'Maybe I will.'

"Q. She was afraid he was going to kill her and he said, 'Maybe I will.'

"A. Yes.

"Q. Did that seem to shock you, Mrs. Jacobi at the time?

"A. Well, not really because I knew quite a bit about their troubles.

"Q. You didn't take it too serious, is that right?

"A. No.

"Q. You didn't think he would do it?

"A. No, I didn't really. I knew she was afraid of him, but I didn't think he would really do it.

"PAUL LUTONSKY, DECEASED'S FATHER:

"Q. All right, let me ask you this: On Labor Day were you at the home of your daughter and son in law?

"A. At the time it happened?

"Q. Yes.

"A. No, Marvin called up and said she was dead.

"Q. Did you see Ray there at that time?

"A. That's right.

"Q. Did you talk to him?

"A. That's right.

"Q. What was said.

"A. Well, when I went in he was sitting on the couch, the door opened from the east and I asked Ray, I said, 'Ray, what happened?' And he said, 'I would rather tell anybody in the world as tell you.' And I said, 'I will find out anyway, you just as well tell me.' And he said, 'I killed her.' And I said, 'Did you have a quarrel and argument?' And he said, 'No.' 'She was going to leave me.'

"Q. She was going to leave him?

"A. She was going to leave him. The last words I said when I went out, I said, 'Ray, it's too late now, but it's the worst thing you could have ever done.' "

Defendant's own account of what transpired, is briefly, that he came home that evening and went to the icebox and got a can of beer. That they were fussing and that Lucille was going to leave him. That he went into the other room and when he returned, his wife had opened another beer, stated that she had poisoned him and was leaving. Defendant then states he remem-

bers nothing until he was holding his dead wife in his arms on the bathroom floor. However, in the testimony of Sheriff Forest McClung, describing that evening, defendant's statements were reported as follows:

"At that time I instructed him of his rights which I told him that anything he said here could be used against him in case he was taken into a court of law for prosecution; also that he had a right to talk to a relative or legal advice, if he so desired. And then at that time I asked him, I said, 'Mr. High, what happened to your wife?' And he said, 'I would rather not say anything at this time until I talk to an attorney.' I said, 'Mr. High, was you here when your wife died?' And he said, 'Yes, I was.' Shortly thereafter I told my deputies to bring Mr. High to the Comanche County Sheriff's Office. And later, after we had finished out there around the High home, I came into Lawton and took a statement from Mr. High."

Following is a copy of that statement.

"STATE'S EXHIBIT #4
10 PM
Signed papers
"AFFIDAVIT STATEMENT

"This is a statement taken in the Comanche County Sheriff's office from Ray High, the husband of Mrs. Lucille High, Sterling, Oklahoma, this Statement is taken in regard to the death of Mrs. Lucille High. Statement taken Sept. 2, 1963 at 9:10 P.M.

"Mr. Ray High I would like to instruct you that anything you say in this statement could be used against you in case you taken into a court of law for prosecution. Also, that you have a right to talk to a relative or legal advice if; you so desire.

"Q. Mr. High would you mind relating to me in your own words what you know in regard to the death of your wife, Mrs. Lucille High.

"A. Well, it is really a long, long story.

"Q. This rope that I hold in my hand —is this the rope that you put around your wife's neck?

"A. Yes, it looks like it, or one just like it.

"Q. Do you know what time that the death of Mrs. High came?

"A. Yes, approximately 15 minutes after five this afternoon.

"Q. Do you know where this rope came from?

"A. I had it there at the house to start a lawn mower.

"Q. Mr. High is there anything else that you would like to add to this statement?

"A. No, not at this time.

"This is a true and correct statement. I have read the foregoing statement and this is correct to the best of my knowledge.

"/s/ Robert R. High"

Defendant's only witness, other than character witnesses, was a Dr. Howard Angus, a general practitioner in Lawton, who testified that he had seen defendant twice before in a hospital, once on July 8 and again on August 20, 1963. That on those two occasions he had been told that defendant had taken an overdose of medicine. When asked if he thought that from what he knew of the defendant, the events could have caused defendant to be in such a state of shock that he would become temporarily insane and not know right from wrong, he answered:

"A. Yes, in my opinion, I think he could have temporarily blacked out."

And, on cross-examination:

"Q. You are not a—

"A. I am not an expert witness.

"Q. You are not an expert on mental diseases, are you?

"A. No sir, that's why I asked Dr. Whitney up to see the patient.

"Q. You admit you are not qualified to answer any of these questions?

"A. Yes, sir."

This is the entire defense presented by defendant, and upon which the first proposition of error is based.

Defendant contends that as a matter of law, he introduced sufficient evidence to raise a reasonable doubt as to his sanity at the time of the commission of the act, and that it then became the duty of the State to prove his sanity beyond a reasonable doubt.

Defendant cites numerous cases to support his contentions, however, all of the cases have considerably more proof of insanity than the case at bar. The only testimony other than defendant's is that of the doctor who admits he is not qualified to testify on mental disease—as an expert or non-expert. That from two fleeting observations of defendant, both sometime prior to the murder, and when defendant was in a state of unconsciousness; that defendant "could have blacked out" at the time of the murder.

In Oklahoma a nonexpert witness may give his opinion as to whether or not a man is insane where it is shown that such witness has had sufficient opportunity for observation of the accused. See, Holt v. State, 84 Okl.Cr. 283, 181 P.2d 573; Hile v. State, 54 Okl.Cr. 127, 15 P.2d 1049; McNeill v. State, 18 Okl.Cr. 1, 192 P. 256.

It is the opinion of this Court, that the testimony in the case at bar does not meet the burden of raising the presumption of insanity. The doctor testified that he had a Dr. Whitney, a qualified psychiatrist, to examine defendant—*but the defense declined to call upon him to testify.*

This Court held in the recent case of Gonzales v. State, Okl.Cr., 388 P.2d 312:

"Where one is being tried for murder, and his defense is insanity, lunacy or unsoundness of mind at time of committing the act, the defendant in the first instance is presumed to be sane and of sound mind, and the burden is upon him to introduce sufficient evidence to raise a reasonable doubt as to his sanity." Title 21, O.S.A. § 152.

See, also, Kennamer v. State, 59 Okl.Cr. 146, 57 P.2d 646.

The evidence which could have raised the question of insanity was rejected by the defense.

Also, it was shown during the trial that the defendant had previously been sent to Ft. Supply for mental observation, and had been sent back for trial. This was certainly not overlooked by the jury. To allow defendant to say that he "blacked out" and "couldn't remember" as a defense for the crime committed, is an absurdity in the instant case.

Defendant's second proposition that the trial court should have sustained the supplemental Motion for New Trial on the grounds of newly discovered evidence will be discussed next.

This evidence consisted of four affidavits —three by friends of defendant, which state in substance that, in their opinion, defendant was insane when they saw him in jail the day following the murder. These statements, in addition to their lack of probative value, are totally irrelevant as far as the defense of temporary insanity is concerned. In no way do they tend to support defendant's claim that he did not know right from wrong at the time he killed his wife. His state of mind in the days following the murder was never an issue in the case.

The other affidavit, by an Osteopath, a Dr. Hixon, is as follows:

" * * * During the entire time that I was in Ray High's presence, he was unnaturally calm. I watched his hands very closely as he wrote me the check, and I was unable to detect the slightest tremor or outward sign of

anxiety or emotion, although his eyes were extremely red. * * * In my opinion, at the time I observed Mr. High, he did not have the slightest realization that he might have done something wrong. He showed far less concern than the average person does when I make a housecall for treatment of a common cold or childhood disease. I was called to testify at the preliminary hearing in this case. To the best of my recollection, I related to the County Attorney or one of his assistants, the facts that I have stated in this Affidavit."

All of the above testimony was available at the time of trial. Defendant had ample opportunity during the five months from the date of the crime to the date of the trial to discover any evidence Dr. Hixon had. Furthermore, he was subpoenaed, but was not called.

This Court held in Mitts v. State, Okl.Cr. 345 P.2d 913:

"Where evidence is urged by defendant on motion for new trial on the ground the same is newly discovered, it must be established that the same, if existing at the time of trial, could not have been procured before trial by the exercise of due diligence, and failure to do so constitutes a bar to a new trial on such ground." 22 O.S.1951 § 952

See, Armstrong v. State, 61 Okl.Cr. 352, 68 P.2d 114; Henderson v. State, 94 Okl.Cr. 45, 230 P.2d 495, 23 A.L.R.2d 1292, certiorari denied 342 U.S. 898, 72 S.Ct. 234, 96 L.Ed. 673.

Under the above rule, the defendant is precluded from taking advantage of the evidence he did not use and which the record shows was available to him at the trial on the merits. To approve the defendant's contention now asserted would open up a new artifice in criminal defense by which a defendant could play fast and loose with the courts. Mitts v. State, Supra.

It is the opinion of this Court that the trial judge did not abuse his discretion in overruling the Motion for New Trial, as none of the affidavits in any way support defendant's theory of legal insanity at the time of the killing.

■■■ Defendant's proposition number three that the defendant was denied due process is totally without support in the record. He contends that it was the duty of the county attorney to advise defendant and the trial court of Dr. Hixon's statement regarding defendant's actions the night of the crime. There is nothing in the record to substantiate the fact that the county attorney knew of any such statement. The affidavit on the Motion for New Trial is the first mention of this. Furthermore, the affidavit does not clearly state to whom the statement was given, or if it was given—it states, "To the best of my recollection—"

This Court held in the case of Whisenhunt v. State, Okl.Cr., 279 P.2d 366:

"The Criminal Court of Appeals will consider only such matters as appear in the record of trial below as reflected in the case-made."

This Court has carefully considered the record in this case, the evidence was sufficient to support the verdict, the instructions were fair and adequate—even favorable to the defendant.

Finding no error meritorious of reversal, the judgment and sentence of the trial court is hereby affirmed.

BUSSEY, P. J., and BRETT, J., concur.