George WILLIAMS, Appellant,

v.

STATE of Oklahoma, Appellee.

No. A–18072.

Court of Criminal Appeals of Oklahoma.

Aug. 14, 1973.

Tom H. Gudgel, Jr. and Robert W. Reynolds, Tulsa, for appellant.

Larry Derryberry, Atty. Gen., Nathan J. Gigger, Asst. Atty. Gen., for appellee.

## OPINION

BLISS, Presiding Judge:

Appellant, George Williams, hereinafter referred to as defendant, was charged, tried before a jury and convicted for the

crime of Murder in the District Court of Tulsa County, Oklahoma. Defendant was sentenced to serve a term of life imprisonment, and from said judgment and sentence defendant has perfected a timely appeal.

Briefly, stated, the evidence adduced at the trial reflects that defendant, a seventy year old retiree, shot and killed his sixty-two year old wife at their residence in Tulsa during the forenoon of February 4, 1972. The shooting occurred at approximately 11:00 a. m., and defendant immediately called the police. The police investigated and defendant was subsequently charged as set out above.

Ron Phillips, a dispatcher for the Tulsa Police Department, testified that at approximately 11:00 a. m. on February 4, 1972, a man who identified himself as George Williams called and stated that he had just shot his wife, that she was dead and that he had emptied his gun into her. Officers were immediately dispatched to investigate.

Officer Jerry Palmer then testified that he arrived at the Williams' home around 11:05 a. m. He knocked twice at the door then pushed it open and found defendant standing in the middle of the living room with the body of the deceased lying on the floor in a bedroom. Defendant was immediately placed under arrest and advised of his rights. The officer testified that defendant was cooperative and coherent during the investigation which ensued. The officer further testified that he remembered defendant stating that the deceased came at him with a pair of scissors and that he killed her. The officer also testified that he observed scratches upon defendant.

Detective Sargeant Larry Johnson arrived at defendant's residence at approximately 11:35 a. m. Johnson testified that defendant stated he and his wife had been experiencing some problems for several days, mainly in connection with his drinking. Defendant awoke at 8:30 a. m. and was later joined by his wife for coffee.

An argument ensued, and defendant's wife threatened him with a pair of scissors. Defendant went to his bedroom, obtained a .45 caliber automatic weapon, loaded it and returned to the northwest bedroom where he shot his wife numerous times.

The witness then stated that it was apparent defendant had been drinking although defendant was then coherent enough to clearly answer questions and relate what occurred. Johnson observed small abrasions on the chin and a couple of scratches on the nose and left side of defendant's face which he acquired during the argument with his wife.

The witness describing the room in which the body was found stated he saw seven spent rounds of .45 cases grouped between the door and a dresser, the eighth on the top of the dresser, and described five holes in the wall and the decedent's wounds. A pair of nickel plated scissors were found lying beneath the left foot of the deceased. The five bullet holes in the wall were described as being "almost together with the fifth hole being immediately to the west of it." Over objection of defense counsel, the witness was permitted to testify that defendant expressed no remorse and stated he was glad it was over. Under cross-examination the witness testified that it was his opinion based upon his investigation and the location of the bullet holes in the wall that the gun was fired rapidly. Dr. Robert Fogel, Consultant Pathologist to the State Medical Examiner, then described four entrance wounds in the back, a wound in the right arm and a wound adjacent to the elbow of deceased. He stated that the arm wounds could have been entrance wounds and that any of the five entrance wounds could conceivably have been fatal. The State then rested.

Defendant took the witness stand in his own defense testifying as follows (Tr. 119–122):

"A. (The witness) Well I got up as usual early. I don't know what time it was. It was one time I didn't look at the clock. And as is

customary I went in the kitchen to make a perculator of coffee and when it got through perking I sat down and had a cup of coffee and then another cup, as usual and then my wife got up as was customary for her around I would say 10 or thereafter, because she usually got home from work at 1:15, provided the streets were clear and she would pretty thoroughly digest the newspaper and naturally it would take some time and she would sleep as a rule until, I would say rarely ever got up until 10 and most of the time I would say 10:30. So she came in and had a cup of coffee with me and I had been hitting the bottle, so to speak, and she started fussing at me about it. So I went over to the kitchen sink and she got up and caught me there at the end of the bar and started clawing like she had before and scratched me up a little bit and so I went on into the bedroom, my bedroom, and laid down on the bed for just a moment and I got up and set up on the side of the bed and she came by down the little hallway there going to the bathroom to what we call the back bedroom and she slammed the door real hard and I heard a little noise in there and I didn't pay much attention to it and then she came out and slammed the door behind herself and as she went by she said "I think I'll just . . .", no, she said "You . . ." and called a name and said "I think I'll just cut your black heart out." So she went in her bedroom, which was the short way to the kitchen and then I heard her dialing the telephone and. . . .

"A. (The witness) Well she went through that room that went into her bedroom, which was the short way to the kitchen and I had this pistol right there beside my bed in the bottom drawer and I picked it

up thinking that she would probably come back. . . .

"A. (The witness) . . . and then I discovered she was using the telephone and I walked over there and I said "Honey don't call, don't call. I'll leave." And the next thing I saw was something up here which I thought was a butcher knife and I had the pistol in my left hand. I didn't have no idea of using it. I was going to try to protect myself to get out of the house and I wanted to stop her from making the telephone call. So she drew back and swung at me and I threw my right arm to try to ward off the blow and she missed me. I don't know if she even touched me or not. I just don't know and I just had the gun down there and I just pulled the trigger and when it went off . . . I've shot a .45 pistol a lot in training bird dogs to keep them from going gun-shy as a puppy, but in an inclosure I had never heard one and I'll tell you honestly it's a terribly loud noise and I just went blank and just stood there just pumping that gun and I promptly went to the telephone and called the Police and they came. One and then another and another and they put me under arrest and put me in handcuffs and brought me down to the jail."

The witness then testified that on two occasions, the most recent being in the summer of 1971, he had had trouble with his wife involving a knife and described the last incident. Defendant, when asked what his feelings were when the deceased swung at him, stated he was fearful, that he thought it was a butcher knife and that he just pulled the trigger.

Defendant on cross-examination stated that he had a drinking problem, that he guessed he was an alcoholic and that drinking had caused considerable marital problems. Defendant further stated that

he took his gun out of the nightstand after the deceased threatened to "cut your black heart out." He then stated that he did not load the weapon since he kept it loaded at all times in his nightstand, and that he did not recall telling the officers that he was not sorry. He further denied telling Officer Johnson that he loaded the gun that morning.

Numerous character witnesses were then called. They all testified, without objection by the State, that they had worked with defendant for many years and that defendant's reputation for truth and honesty in the community was good.

■ Defendant's first proposition in error urges that the trial court committed fundamental and reversible error in refusing to instruct on manslaughter. With this contention we agree. An examination of the record reflects that the trial court gave the following instructions, to-wit:

"INSTRUCTION NO. 5: The statutes of Oklahoma provide that homicide is murder when perpetrated without authority of law, and with a premeditated design to effect the death of the person killed, or of any other human being.

"INSTRUCTION NO. 6: The statutes of Oklahoma provide that a design to effect death is inferred from the fact of killing, unless the circumstances raise a reasonable doubt whether such design existed.

"INSTRUCTION NO. 7: The statutes of Oklahoma provide that a design to effect death sufficient to constitute murder may be formed instantly before committing the act by which it is carried into execution."

The record further reflects that the trial court failed to instruct on manslaughter in the first degree although defendant requested in writing a proper manslaughter instruction and objected to the trial court's refusal to submit same.

In Wood v. State, Okl.Cr., 486 P.2d 750, this Court held as follows:

"It is the general rule that passion resulting from fright or terror may be sufficient to reduce a homicide from murder to manslaughter and such a killing may be closely akin to a killing in self-defense. * * * A homicide may be reduced from murder to manslaughter where the killing was done because the slayer believed that he was in great danger, even if he was not warranted in such belief or where the slayer although acting in self-defense was not himself free from blame." (Citations omitted)

In Tarter v. State, Okl.Cr., 359 P.2d 596, this Court further held that:

" * * * whether there is any evidence tending to reduce the degree of the homicide from murder to manslaughter, the trial court should give the defendant the benefit of any doubt * * *"

This Court in Brown v. State, Okl.Cr., 271 P.2d 733, citing Igo v. State, Okl.Cr., 267 P.2d 1082, held:

"Where a defendant is charged with the crime of murder, it is the duty of the trial court to instruct on the law of manslaughter in the first or second degree, if there is any evidence that the alleged crime might have been committed under circumstances that would reduce the crime from murder to manslaughter, and this is true whether the evidence comes from witnesses produced by the State or the accused, or by both."

In the instant case the instructions submitted to the jury by the trial court did not permit any conviction less than murder, even though the defendant's evidence reasonably suggested the lesser crime of manslaughter in the first degree should defendant fail to prove self-defense. There were no witnesses to the homicide other than defendant. The jury might reasonably interpret the evidence to show that the initial firing of the gun was caused by a sudden and unexpected attempt to attack defendant with a pair of scissors and fired by the defendant while in a heat of passion. The lack of a premeditated design to effect death should

have been submitted to the jury by a proper manslaughter in the first degree instruction.

■ This Court has held many times that if there is any evidence that would reduce the crime from murder to manslaughter the trial court should instruct upon manslaughter in the first degree. Welborn v. State, 70 Okl.Cr. 97, 105 P.2d 187; and Tucker v. State, 66 Okl.Cr. 335, 92 P.2d 595.

■ The Court, therefore, finds that the trial court's failure to submit an instruction on manslaughter in the first degree constitutes fundamental and reversible error.

■ Defendant next contends that the trial court committed reversible error in submitting to the jury the following instruction concerning intoxication:

"The statutes of Oklahoma provide that homicide committed with a design to effect death is not the less murder because the perpetrator was in a state of anger or voluntary intoxication at the time."

With this contention we also agree.

■ The evidence of both State and defendant reflects that defendant had been drinking on the morning in question. If the trial court in its discretion found under the evidence presented that an instruction on the intoxication should be submitted, then the instruction submitted should instruct the jury on all law pertaining to intoxication and homicide. In Oxendine v. State, Okl.Cr., 335 P.2d 940, this Court, citing Mott v. State, 94 Okl.Cr. 145, 232 P.2d 166, held that if there is evidence of intoxication in a homicide case, then the following instruction would be proper:

"You are instructed that homicide committed with a design to effect death is not the less murder because the perpetrator was in a state of voluntary intoxication at the time. However, one of the elements of the crime of murder is an intent to effect the death of the person killed and if you find that the defendant at the time of the killing was so completely drunk as to be totally unable to

form an intent to kill, or if you have a reasonable .doubt thereof, you should not find the defendant guilty of murder. The homicide, under such circumstances, unless otherwise excusable, would amount to manslaughter in the first degree."

Therefore, if the trial court in a proper exercise of its judicial duty found that there was sufficient evidence to warrant an instruction concerning intoxication in the instant case, then the above and foregoing instruction would have been the proper instruction to submit to said jury. To instruct otherwise in the instant case constitutes reversible error.

■ Defendant next contends that the trial court erred in failing to submit an instruction to the jury defining the term "aggressor" in conjunction with its instruction on self-defense. With this contention we also agree.

The trial court in its instruction No. 12 relating to the issue of self-defense stated that if the jury found the homicide to be justifiable they should have acquitted defendant "unless you believe from the evidence beyond a reasonable doubt that he entered voluntarily into the difficulty armed with a deadly weapon at the time or that he was the aggressor."

Defendant argues that the trial court rendered the self-defense instructions useless and ineffective by submitting undefined statements about "aggression" and not defining what constitutes an "aggressor." In Gibbons v. Territory, 5 Okl.Cr. 212, 115 P. 129, this Court held:

"When, in a homicide case, the state endeavors to show that the defendant sought or brought on the difficulty, and the general rules of law are charged on this phase of the case, the court should define and state what character of acts on the part of the defendant would deprive him of the right of self-defense."

■ The failure to instruct concerning the definition of the word "aggressor" may certainly cause confusion in the minds of a jury. Scaggs v. State, Okl.Cr., 417 P.2d

331. It is prejudicial to a defendant to give an instruction on the issue of self-defense which tends to describe him as an aggressor without further definition of aggression and the aggressive acts that would deprive him of self-defense.

For the reasons set out above, it is the opinion of this Court that the trial court erred in failing to submit an instruction defining "aggressor."

This Court, therefore, holds that the trial court's failure properly to instruct on manslaughter in the first degree constitutes fundamental error, and trial court's failure properly to instruct concerning intoxication and defining "aggressor" constitutes reversible error; and for said reasons the conviction of defendant, George Williams, should be, and the same is hereby reversed and remanded for new trial.

BUSSEY and BRETT, JJ., concur.