Devery Lester HOGUE, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–81–323.

Court of Criminal Appeals of Oklahoma.

Oct. 13, 1982.

Brian L. Dickson, Norman, for appellant.

Jan Eric Cartwright, Atty. Gen., Susan Talbot, Asst. Atty. Gen., Chief, Appellate Crim. Div., Oklahoma City, for appellee.

## OPINION

CORNISH, Judge:

Devery Hogue appeals his conviction of Murder in the First Degree. He was sentenced by a Grady County jury to life imprisonment.

On May 10, 1980, Devery Hogue shot and killed his great-grandfather, Charlie Powell. The State established that Hogue had lived with his great-grandparents, Ethel and Charlie Powell, since he was seven years old. Hogue was nineteen at the time of the killing. The State's evidence showed that on the evening of the homicide Hogue and his great-grandfather had an argument over Hogue's drinking beer. Hogue annoyed at his great-grandfather, went into his bedroom and retrieved his single shot .20 gauge shotgun. As Mr. Powell sat in a living room chair, Hogue shot him three times at close range.

The State also introduced evidence of several statements made by Hogue shortly after the shooting. Deputy Sheriff Ratcliff testified that when he arrived at the Powell home Devery Hogue met him at the front door. Deputy Ratcliff stated that Hogue informed him that he had just shot Charlie Powell "and it was Murder in the First Degree." Ratcliff further testified that Hogue stated that "he told his grandfather to quit f——g with him or he was going to kill him."

The State also called Officer Charles Smith of the Chickasha Police Department. Officer Smith corroborated Deputy Ratcliff's testimony pertaining to the statements made by Hogue at the crime scene. Smith additionally testified that at the time Hogue was being fingerprinted he stated, "a lot of people think I'm crazy but I know

exactly what I was doing. I'd do it all over again if I had the chance." Smith also testified that Hogue had the odor of beer on his breath but he did not appear to be intoxicated.

David Carpenter, a paramedic who was called to the scene, testified that he overheard a conversation between Hogue and his great-grandmother. Hogue told her "not to worry . . . they would put him in the nuthouse before they would give the death penalty." Hogue also told his great-grandmother that, "I told you yesterday I'd kill the old son-of-a-bitch if he didn't leave me alone."

In his defense the appellant called several witnesses in an attempt to establish: (1) his insanity at the time of the crime; and, (2) an absence of deliberate intent to unlawfully take the life of his great-grandfather.

In regard to the insanity issue, the appellant called Doctor Hugh Conner, a medical doctor specializing in psychiatry. Dr. Conner testified that he treated Hogue from 1976 through 1979. He stated that Hogue was schizophrenic and experienced sociopathic tendencies. He treated Hogue with anti-psychotic medication. When asked about Hogue's ability to distinguish between right and wrong, Dr. Conner testified that based upon his experience with Devery Hogue it was his opinion that Hogue generally knew the difference between right and wrong.

■ The appellant's first two propositions of error raise issues in regard to the death penalty. We decline to address each of these issues since the jury did not impose the death penalty, but instead recommended life imprisonment. The thrust of the appellant's argument is that the exclusion of veniremen who are unalterably opposed to the death penalty creates a jury which is "conviction prone." Consequently, he asserts that he was denied his right under the Sixth and Fourteenth Amendments to a fair and impartial jury.

This issue was briefly addressed in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). In considering this issue the U.S. Supreme Court stated:

.. He maintains that such a jury, unlike one chosen at random from a cross-section of the community, must necessarily be biased in favor of conviction, for the kind of juror who would be unperturbed by the prospect of sending a man to his death, he contends, is the kind of juror who would too readily ignore the presumption of the defendant's innocence, accept the prosecution's version of the facts, and return a verdict of guilt. To support this view, the petitioner refers to what he describes as "competent scientific evidence that death-qualified jurors are partial to the prosecution on the issue of guilt or innocence."

The data adduced by the petitioner, however, are too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt. We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction. In light of the presently available information, we are not prepared to announce a *per se* constitutional rule requiring the reversal of every conviction returned by a jury selected as this one was.

In an attempt to convince this Court that a "death qualified" jury is more conviction prone, the appellant cites a multitude of studies which inferentially conclude that a "death qualified" jury is more likely to convict. We are not persuaded by these studies that a per se constitutional rule requiring reversal where a defendant is convicted by a "death qualified" jury.[1] In this particular case, there is no justification for reversal. The appellant has not shown that the jury in his trial was biased or partial to his cause.

Further, in *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968), the Supreme Court was asked to determine whether the petitioner was denied his constitutional right to an impartial jury when the prosecution was allowed to challenge for cause jurors who were opposed to capital punishment. In *Bumpers v. North Carolina,* supra, the defendant received a life sentence. The Supreme Court noted that their decision in *Witherspoon* did not govern where the jury recommends a sentence of life imprisonment. The Supreme Court further asserted "[t]he petitioner adduced no evidence to support the claim that a jury selected as this one is necessarily 'prosecution prone,' and the materials referred to in his brief are no more substantial than those brought to our attention in *Witherspoon.*" In this case, based upon the foregoing reasons, we refuse to reverse the appellant's conviction based upon the jury selection.

■ The appellant in his final argument requests this Court to reevaluate our past decisions and find a constitutional duty for the State to provide funds for an independent psychiatrist to examine an indigent defendant. We continue to be of the opinion that there is no duty on the State to provide an independent psychiatrist for indigent defendants. See, *Cox v. State,* 644 P.2d 1077 (Okl.Cr.1982) (rev'd on other grounds); *Eddings v. State,* 616 P.2d 1159 (Okl.Cr.1980), —— U.S. ——, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (remanded for resentencing); *Rouse v. State,* 594 P.2d 787 (Okl. Cr.1979). Further, in this case, the record establishes that Hogue did introduce testimony of an independent psychiatrist.

We have reviewed the entire record at bar and find that the jury's verdict is supported by the evidence. Accordingly, we AFFIRM the appellant's judgment and sentence.

BRETT, P. J., and BUSSEY, J., concur.

---

1. For an excellent discussion on this issue in regard to some studies cited by the appellant in this case, see *Smith v. Balkcom,* 660 F.2d 573 (5th Cir. 1981). The Fifth Circuit in *Smith* also rejected the argument that a "death qualified jury controvenes the Sixth and Fourteenth Amendments" right to an impartial jury. See also, *Hooks v. State,* 416 A.2d 189 (Del.Supr. 1980).