**Anthony Ray MUNN, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–81–350.**

Court of Criminal Appeals of Oklahoma.

Jan. 13, 1983.

As Corrected Jan. 18, 1983.

David W. Carter, Lawton, for appellant.

Jan Eric Cartwright, Atty. Gen., Susan Talbot, Asst. Atty. Gen., Chief, Appellate Crim. Div., Oklahoma City, for appellee.

## OPINION

CORNISH, Judge:

Anthony Ray Munn was convicted of Murder in the First Degree and sentenced to death.

This criminal episode unfolds a most gruesome and sadistic murder. It is remarkable in its atrocity and lack of provocation. On June 25, 1980, the appellant was sleeping at his parents' home in Lawton, Oklahoma. At approximately 3:00 a.m., the appellant entered his parents' bedroom by knocking down the door. He walked toward his father and began beating him incessantly. The appellant's mother and sister unsuccessfully tried to stop him. Munn grabbed a pair of scissors, which were next to the bed, and began stabbing his father. He stabbed him about forty times and inflicted two large incisional wounds. The appellant then eviscerated his father's abdominal organs and heart.

### I.

Munn admitted killing his father but asserts that he was insane at the time of the commission of the act. Munn advances that the State did not sufficiently rebut his defense of insanity, and therefore the trial court erred in failing to direct a verdict in his favor.

Oklahoma recognizes the *M'Naghten* test for criminal responsibility. 21 O.S. 1981, § 152. The initial burden is on the defendant to establish a reasonable doubt as to his sanity. Once the defendant establishes a reasonable doubt of his sanity, the presumption of sanity vanishes and it is incumbent upon the State to prove beyond a reasonable doubt that the defendant could distinguish between right and wrong and was therefore sane at the time of the offense. *Bills v. State,* 585 P.2d 1366 (Okl.Cr. 1978).

In this case, there is no question that Munn raised a reasonable doubt as to his sanity at the time of the killing. Munn introduced the testimony of two expert witnesses. His first witness, Dr. Raul Giacoman, a psychiatrist, testified that Munn had voluntarily sought his services about eight months prior to the killing. Dr. Giacoman stated that he examined the appellant on five different occasions. Munn had a history of drug and alcohol involvement which caused outbursts and temper. Dr. Giacoman prescribed tranquilizers for Munn which relieved his symptoms.

Dr. Giacoman stated that in his opinion Munn suffered from a drug induced psychosis and a borderline personality disorder. He further testified that the appellant generally seemed to conform to society and was cooperative, however he was completely opposite when under the influence of drugs. Explaining further, he stated Munn would have poor judgment, and in some instances he would not know whether he was doing the right thing.

On cross-examination Dr. Giacoman stated he did not examine Munn at any time after the killing. He also stated that the five interviews lasted for about fifteen to twenty minutes. He concluded that Munn did not know right from wrong "when he killed his father. He was under the influence of drugs."

The appellant's second expert witness was Dr. Loraine Schmidt, a medical doctor and psychiatrist. Her qualifications are nu-

merous and undisputed. Dr. Schmidt testified that she examined Munn pursuant to a court order. Her examination revealed that Munn had a borderline personality disorder and suffered from alcohol and marijuana abuse. Dr. Schmidt informed the jury that because of Munn's type of personality and the action which occurred, she did not believe Munn knew right from wrong during the commission of the crime.

On cross-examination Dr. Schmidt testified that Central State Hospital diagnosed Munn to be sane at the time of the killing. She further stated that on December 31, 1980, she diagnosed Munn mentally competent to stand trial; was able to distinguish between right and wrong and could aid his attorney. Dr. Schmidt further testified the appellant had an intelligence quotient of 76, which was dull normal.

The State attempted to discredit the testimony of the defense experts by trying to establish the inherent impreciseness of any opinion concerning another person's mental condition. The State also examined the inconsistencies between Dr. Giacoman's diagnosis and Dr. Schmidt's diagnosis of Munn's mental condition. It was also brought out that Dr. Schmidt did not examine Munn until several months after the commission of the act. Additionally, Dr. Giacoman did not interview the appellant at any time subsequent to the homicide. Defense experts also testified that Munn was sane prior to the homicide and also legally competent subsequent to the homicide.

The State then introduced eight witnesses to rebut the appellant's defense of insanity. The evidence consisted of the testimony of one expert witness and seven lay witnesses who observed the appellant's conduct and behavior shortly after the killing.

Mary Sanders, a registered nurse, testified that she gave Munn medical attention while he was in custody at the Comanche County jail. She stated that he was cooperative and responded well to her questions. She further said that Munn appeared to understand and follow her directions. Sanders observed the appellant about a month after the killing.

Esther Blevins, a psychological assistant at Western State Hospital, testified as an expert witness for the State. Ms. Blevins holds a Masters Degree in Psychology and has worked in the field for thirteen years. The appellant on appeal questions the qualifications of Ms. Blevins as an expert. We find that the trial court did not abuse its discretion by allowing Ms. Blevins' expert testimony. We also note that the appellant made no objection at trial to her qualifications as a clinical psychologist.

Ms. Blevins testified that Munn was confined to Western State Hospital from June 27, 1980, until July 9, 1980, to determine whether he knew the difference between right and wrong and whether he could assist in his own defense. She revealed that the doctors who evaluated Munn during his stay diagnosed him as having no mental disorders.

Ms. Blevins conducted several tests with the appellant. He was administered the Bender-Gestalt test, the Slosson Oral Reading test, the Hooper Visual Organization test, and the Wechsler Adult Intelligence Scale. Ms. Blevins explained to the jury the objective of the tests and explained how the appellant performed on each test. She testified that her clinical impression, based upon her observations and the tests, was that Munn was functioning within the borderline range of intelligence and she believed that he knew the difference between right and wrong. She further stated that there was no evidence of psychosis in any of the tests. Finally, Ms. Blevins testified that a borderline personality disorder is not an organic illness or disease but instead a maladjustment problem.

The State also called Otis Russell, a Lawton police officer who had driven Munn to the police station shortly after the killing. He testified about Munn's behavior subsequent to the arrest. Munn made no statements during the ride to the police station. Later at the station, it was discovered that Munn had been shot in the back of the leg at the time of his arrest. Russell testified that Munn followed his directions while in custody and appeared to understand what was going on around him.

Bill Thomas, a guard at the jail, testified about Munn's behavior while he was incarcerated. Thomas observed the appellant on a daily basis for over eight months. He stated that Munn ate regularly; displayed good personal hygiene; played cards with other inmates; read the Bible and other books; and was generally cooperative and sociable. Thomas further testified, however, that on two occasions Munn attempted suicide. During the first incident, Munn wrapped a pair of overalls around his neck but did not hurt himself. The next day Munn clasped his hands around his throat. Thomas talked to him a few minutes and Munn removed his hands from his throat.

Dr. Algood testified about his observations of the appellant at the time he removed the bullet from Munn's leg. Dr. Algood stated that when he questioned Munn about the wound he responded appropriately on each occasion. He further stated that Munn was calm and quiet during the examinations.

The State next called Richard McMillan and Michael Hoffman. Both are toxicologists at Medical Arts Laboratory. They testified that on June 26, 1980, they analyzed the appellant's urine to detect the presence of drugs or alcohol. Both witnesses explained the tests that were taken and the results which showed there were no drugs or alcohol present on June 26, 1980. This evidence directly rebutted Dr. Giacoman's testimony that Munn acted under the influence of drugs.

The State's final rebuttal witness was Patricia Quarles, an emergency room admissions clerk at Memorial Hospital. Ms. Quarles filled out the appellant's medical chart the night of the homicide. She testified that Munn signed the chart at her request and she filled out the appellant's personal data based upon his responses. Munn accurately informed Quarles about his birth date, age, marital status, and current address. She concluded that the appellant was calm, quiet and appeared to be "normal."

Also relevant on the issue of the appellant's mental condition was the testimony of the arresting officers during the State's case-in-chief. Officers Thorne and McDougle testified that they were called to the scene of the homicide. When they arrived at the scene they observed the appellant standing over his father with a pair of scissors in one hand and a heart organ in the other hand. The appellant walked past the officers and exited the house. Once outside the officers attempted to remove the scissors from Munn and place him under arrest. Munn resisted and attempted to flee from the scene. Officer Thorne testified that during one struggle the appellant attempted to stab him with the scissors and then ran down the street. Thorne shot at Munn four times as he fled. The two officers chased Munn about two blocks where he finally collapsed due to exhaustion. Munn was at this time handcuffed.

We have consistently held that the question of a defendant's sanity at the time of the commission of the criminal act is a question of fact for the jury and will not be disturbed on appeal where there is sufficient evidence to support the finding. *Garrett v. State*, 586 P.2d 754 (Okl.Cr.1978). Furthermore, this Court will not inquire into the credibility of the witnesses nor weigh the conflicting testimony. *Jones v. State*, 479 P.2d 591 (Okl.Cr.1971).

In *Stidham v. State*, 507 P.2d 1312 (Okl.Cr.1973), we stated that "testimony of experts as to defendant's sanity at the time of the psychiatric examination is only evidence to be considered along with other testimony on the issue of sanity at the time of the alleged offense. The expert's testimony is not conclusive on that issue." See *Jones v. State*, 479 P.2d 591 (Okl.Cr.1971). The weight and credibility of expert opinion is for the jury to determine and such testimony is not conclusive even where it is uncontroverted.

In determining the question of insanity, it is the jury's duty to look at all the evidence, not merely the testimony of the expert witness. The jury must determine the weight and credibility of both expert and lay witnesses in light of the particular

facts and circumstances shown in the case. Our duty is to review the record as a whole in a light most favorable to the State and determine as a matter of law whether the State's evidence was sufficient to support the jury's finding that Munn was legally sane at the time of the offense. See *West v. State,* 617 P.2d 1362 (Okl.Cr.1980).

■ We hold that the State's expert testimony of Ms. Blevins and the extensive testimony of lay witnesses who observed Munn shortly after the alleged offense was sufficient to support the jury's conclusion that Munn could distinguish between right and wrong when he killed his father. Also, the verdict is not so palpably against the weight of the evidence as to indicate that it rests upon passion or prejudice.

## II.

■ The appellant next claims that fundamental error occurred when the prosecutor asked Dr. Schmidt if she would commit Munn today in light of her diagnosis and tests, if the same results were present. Dr. Schmidt responded, "Well, he might be committed. That doesn't mean that he would be kept." The appellant candidly acknowledges that no objection was made to this comment and therefore this alleged error is not properly preserved on appeal. *McGlumphy v. State,* 538 P.2d 1097, 1101 (Okl.Cr.1975). A careful review of the comment in light of the entire transcript convinces this Court that it does not constitute fundamental error.

## III.

■ The appellant requests this Court to consider the present viability of the *M'Naghten* rule in light of the advancement in the science of psychiatry. This Court addressed this issue in *Jones v. State,* 648 P.2d 1251 (Okl.Cr.1982), in which we held that the *M'Naghten* right and wrong test as a standard for criminal responsibility does not violate due process principles of justice. We find *Jones v. State,* supra, to be dispositive of this issue.

## IV.

■ Munn, lastly, argues that his sentence of death is excessive and disproportionate as compared to similar cases. See 21 O.S.1981, § 701.13(C)(3). Unfortunately, appellate counsel has failed to cite any cases to support this proposition. Under our statutory authority and due to the magnitude of sentence, this Court will make an independent evaluation of the appropriateness of the death penalty considering the crime and the appellant, Munn.

■ As discussed in *Jones v. State,* supra, this Court will make a limited comparison of murder cases decided prior to the enactment of the current death penalty statute. We have examined numerous cases in which an accused has killed a close family member without provocation and raised a reasonable doubt as to his insanity at the time of the crime. Based upon these similar cases, we hold that the imposition of the death penalty in this case was disproportionate. *Hogue v. State,* 652 P.2d 300 (Okl.Cr.1982); *Burrows v. State,* 640 P.2d 533 (Okl.Cr.1982); *Naum v. State,* 630 P.2d 785 (Okl.Cr.1981); *Stedman v. State,* 568 P.2d 350 (Okl.Cr.1977); *Cooper v. State,* 524 P.2d 793 (Okl.Cr.1974); *Castleberry v. State,* 522 P.2d 257 (Okl.Cr.1974); *Williams v. State,* 513 P.2d 335 (Okl.Cr.1973); *Grist v. State,* 510 P.2d 964 (Okl.Cr.1973); *Meadows v. State,* 487 P.2d 359 (Okl.Cr.1971); *High v. State,* 401 P.2d 189 (Okl.Cr.1965).

A case remarkably similar in regard to both the defendant and the crime is *Hogue v. State,* 652 P.2d 300 (Okl.Cr.1982). In *Hogue,* the appellant without any apparent provocation shot and killed his great-grandfather. Devery Hogue killed his seventy-eight year old great-grandfather with three shotgun blasts to his chest as he sat in the living room. The evidence revealed that Hogue had lived with his great-grandfather most of his life and they had experienced a loving relationship. Prior to the shooting, Hogue had received psychiatric treatment. The treatment resulted from an incident in which Hogue burned his mother.

In that case, Hogue was at the scene of the crime when the police arrived. He vol-

untarily admitted shooting his great-grandfather. At trial, Hogue introduced a defense of insanity and, in the alternative, he attempted to show that he did not entertain the requisite malice for murder in the first degree.

The jury found Hogue guilty of murder in the first degree, under the new death penalty statute. However, in the sentencing proceeding, the jury refused to recommend the death penalty, but recommended life imprisonment. Considering the factual circumstances in *Hogue,* which substantially parallel the criminal episode at bar, we find that Munn's sentence of death should be modified to life imprisonment under 21 O.S.1981, § 701.13(C)(3).

In determining the appropriateness of the death penalty, we also have taken into consideration the improper cross-examination by the prosecutor inferring that if Munn was found not guilty by reason of insanity, he would be shortly released from commitment. Though not fundamental error on the issue of guilt, it may very well have affected the sentence. In a death case this Court is vested with the duty to examine the entire record to determine whether the jury was improperly influenced in accessing the death penalty.

Therefore, in accordance with the foregoing discussion, the judgment is AFFIRMED, except as to the imposition of the death sentence; the death sentence is vacated and the case shall be REMANDED AND MODIFIED to life imprisonment. 21 O.S.1981, § 701.13.

BRETT, J., specially concurring.

BUSSEY, P.J., concurs in part and dissents in part.

BRETT, Judge, specially concurring:

This Court has a statutory duty to determine whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. 21 O.S.1981, § 701.13(C)(3). The plurality opinion interprets this requirement to mean that the factors pertinent to the comparison of both the crime and the defendant are (1) the crime involved the killing of a family member without provocation and (2) the appellant claimed to be legally insane at the time of the crime. I fail to understand why these were the sole criteria chosen on which to base a comparison with other cases. Based on this reasoning, anytime a person murders a member of his family, he is guaranteed at most a sentence of life imprisonment if he pleads insanity at the time of the crime. This Court has, in effect, judicially legislated out of our statute one particular group of murders involving these circumstances.

While it is true that the U.S. Supreme Court has given the states little information concerning this issue, some guidance can be found in recent cases. The Court has stated [1] that the decision to impose the death penalty in one case, but not in another, may be justified by any factual circumstance which relates to the offense itself or to the character or record of the defendant.

In *Godfrey v. Georgia,*[2] the Supreme Court reversed the appellant's death sentence because it found the Georgia Supreme Court had adopted such a broad and unique construction of the Georgia death sentence statute as to violate the Eighth and Fourteenth amendments. Although the Court was considering a somewhat different issue in *Godfrey v. Georgia,* some factors relating to the defendant and the crime that the Court looked at are helpful to our inquiry in the present case. In *Godfrey* the Supreme Court found that:

> The petitioner's crimes cannot be said to have reflected a consciousness materially more "depraved" than that of any person guilty of murder. His victims were killed

**1.** *Lockett v. Ohio,* 438 U.S. 586, 602–05, 98 S.Ct. 2954, 2963–2965, 57 L.Ed.2d 973 (1978) (plurality opinion); *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976).

**2.** *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 1767, 64 L.Ed.2d 398 (1980).

instantaneously. They were members of his family who were causing him extreme emotional trauma. Shortly after the killings, he acknowledged his responsibility and the heinous nature of his crime. These factors certainly did not remove the criminality from the petitioner's acts. . . . There is no principled way to distinguish this case.

I would begin with the factors enunciated in *Godfrey,* in determining whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases. Even the majority opinion agrees that this was "a most gruesome and sadistic murder . . . remarkable in its atrocity and lack of provocation." The victim was beaten and stabbed numerous times before his heart was cut out, therefore he was not killed instantaneously as was the victim in *Hogue v. State,* the case cited for comparison by the majority. Further, unlike *Hogue,* when the police attempted to apprehend the appellant, he tried to stab one officer and then took off running before he was overtaken and handcuffed. From an analysis of these factors, I cannot say the sentence of death was excessive or disproportionate to the penalty imposed in similar cases.

However, I agree that the sentence of death should be modified to life imprisonment based on the improper cross-examination by the prosecutor inferring that if Munn were found not guilty by reason of insanity he would be shortly released from commitment. This was a factor outside the purview of the jury and may have misled the jury in its assessment of the facts. Also, the pictures introduced by the State depicting the victim lying on the floor with his organs exposed were prejudicial and wholly irrelevant. There was no issue in the case pertaining to the method of death or who killed the deceased, therefore the photographs should not have been admitted. I acknowledge that the photographs were never objected to at trial nor was their improper admission raised as error on appeal. However, in a death case this Court is vested with the duty to examine the entire record to determine whether the jury was improperly influenced in assessing the death penalty. It is, therefore, my opinion that these two factors were sufficient to improperly influence the jury to assess the death penalty.

BUSSEY, Presiding Judge, concurs in part and dissenting in part:

I concur in the affirmance but dissent to the modification of the sentence from death to life imprisonment.